IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**DOCKETED**

JUN 2 8 2004

| | |
|---|---|
| MADISON HOBLEY, | ) |
| Plaintiff, | ) 03 C 3678 |
| v. | ) Judge Aspen |
| JON BURGE, et al. | ) Magistrate Brown |
| Defendants. | ) |

**FILED**

JUN 2 4 2004

UNITED STATES DISTRICT COURT

## NOTICE OF FILING

TO:

Terrence M. Burns
Harry N. Arger
DYKEMA GOSSETT ROOKS, et al.
10 South Wacker, Suite 2300
Chicago, IL 60606

Andrea D. Lyon
DePaul College of Law
25 East Jackson Blvd.
Chicago, IL 60604

June K. Ghezzi
JONES DAY
77 West Wacker
Chicago, IL 60601

James G. Sotos
HERVAS, SOTOS, et al.
333 Pierce Road, Ste. 195
Itasca, IL 60143

Ilene Letts
GREENE & LETTS
111 West Washington St.
Suite 1650
Chicago, IL 60602

Please take notice that on June 24, 2004, I filed the
attached AMENDED COMPLAINT at the United States Courthouse, 219 South
Dearborn in Chicago, IL.

LOEVY & LOEVY
312 N. May, Ste. 100
Chicago, IL 60607
(312) 243-5900

ANDREA D. LYON
Center for Justice in Capital Cases
DePaul College of Law
25 E. Jackson Blvd.
Chicago, Il 60604
(312) 363-8402

## CERTIFICATE OF SERVICE

I, Heather Jacobson, certify that on June 24, 2004, I delivered the above-referenced documents to the above-named counsel by first class mail.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MADISON HOBLEY,

        Plaintiff,

        v.

CHICAGO POLICE COMMANDER JON BURGE,
DET. ROBERT DWYER, DET. JAMES LOTITO,
DET. VIRGIL MIKUS, DET. DANIEL McWEENEY,
DET. JOHN PALADINO, SGT. PATRICK
GARRITY, and the CITY OF CHICAGO,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

03 C 3678

Judge Aspen

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

        NOW COMES Plaintiff, MADISON HOBLEY, by his attorneys, LOEVY & LOEVY and ANDREA D. LYON, and complaining of Defendants, JON BURGE, ROBERT DWYER, JAMES LOTITO, DANIEL McWEENEY, JOHN PALADINO, VIRGIL MIKUS, PATRICK GARRITY, and the CITY OF CHICAGO, states as follows:

### Introduction

        1.   This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

        2.   Specifically, as a result of egregious police misconduct and abuse more fully described below, Plaintiff Madison Hobley was wrongfully convicted for a heinous set of crimes which he did not commit.  In all, Mr. Hobley spent more than sixteen years in prison, thirteen of which were on Death Row, after the Defendants conspired to secure his conviction unlawfully by means of violation of his constitutional rights.

3. After asserting his innocence for more than a decade, the Illinois Supreme Court eventually granted Mr. Hobley leave to conduct extensive discovery into the circumstances of his conviction and the now-notorious pattern of systematic and institutional Area 2 police abuses that produced it. Through the efforts of his counsel, Andrea D. Lyon of the Center for Justice in Capital Cases of the DePaul College of Law, as well as Kurt Feuer, working *pro bono* for the firm of Ross & Hardies, Mr. Hobley was able to prove facts establishing both his innocence and the reprehensible pattern of police abuse that gave rise to his wrongful conviction.

4. After reviewing the extensive evidence of Mr. Hobley's innocence and the deceitful and unlawful actions of the Defendant Officers, on January 10, 2003, then-Governor George Ryan granted Mr. Hobley a full pardon on grounds of innocence. Mr. Hobley was subsequently released from Death Row after spending sixteen years and four days wrongfully incarcerated.

### Jurisdiction and Venue

5. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred within district.

### The Parties

7. Plaintiff, Madison Hobley, was at all relevant times a citizen of the United States and a resident of Cook County, Illinois.

2

8. Defendant City of Chicago is an Illinois municipal corporation, and is and/or was the employer of each of the Defendants. The City of Chicago is responsible for the acts of the Defendants while employed by the City of Chicago and while acting within the scope of their employment.

9. All of the individual Defendants are present or former Chicago Police Officers. At the time of Mr. Hobley's arrest and interrogation, Defendant Jon Burge was a duly appointed commander of the City of Chicago Police Department's (hereafter, the "Department") Area 2 Violent Crimes Division and/or Bomb and Arson Division; Defendant Virgil Mikus is or was a detective of the Department's Bomb and Arson Division; Defendant Patrick Garrity is or was a Sergeant in the Department's Crime Laboratory; and Defendants Robert Dwyer, James Lotito, Virgil Mikus, Daniel McWeeney, John Paladino are or were detectives in the Department's Area 2 Violent Crimes Division of which Jon Burge was the Commander.

10. All of the foregoing individuals are sued in their individual capacities, and all acted under color of law and in the scope of their employment in engaging in their interactions with Mr. Hobley.

### Background

11. In January 1987, Plaintiff Madison Hobley lived with his wife, Anitta, and infant son, Phillip, in an apartment building on Chicago's South Side, where he worked for a medical supply company. Prior to the wrongful conviction described in this complaint, Mr. Hobley had no previous criminal convictions.

3

12. Early in the morning hours of January 6, 1987, Mr. Hobley awoke to the sound of a fire alarm. Dressed only in shorts and a T-shirt, Mr. Hobley went from his family's apartment at the top of the inner stairwell on the third floor, into the hallway to investigate the source of the alarm.

13. Believing that he saw smoke coming from under the door of an apartment across from his, Mr. Hobley walked past the stairway door towards the unit down the hall. Mr. Hobley then heard a loud sound as the fire door failed, releasing a raging fire. The glass partition exploded, and a wall of fire and smoke erupted from the stairwell, preventing Mr. Hobley from returning to his wife and baby son.

14. Blocked by the fire, Mr. Hobley attempted to shout to his family, urging them to head for a window to escape. He then crawled down the hall and out of the building via the back stairs. Mr. Hobley never again saw either his wife or his son.

15. Despite the confusion of the inferno around him, and the fear he felt for the safety of his family, Mr. Hobley's immediate reaction was to help others in their time of need. He helped save the life of a neighbor's baby when he helped catch the child as it was dropped out of a second-floor window.

### Attempts to Coerce a Confession

16. Upon discovering that Mr. Hobley survived the fire and his family did not, the Defendant Officers immediately concluded that Mr. Hobley was responsible, deliberately ignoring information about a disgruntled former tenant who had been recently evicted from the building for selling drugs, and failing

4

to pursue any other evidence or investigate any leads to find the real perpetrator of the crime. Instead, the Defendant Officers closed their case before it even began, taking Mr. Hobley from his mother's home less than five hours after he escaped from the deadly fire that killed his wife, Anitta, and young son, Phillip.

17. The now-infamous Area 2 Violent Crimes detective bureau, of which most of the Defendant Officers were members, spent the day interrogating and torturing Mr. Hobley, who was at the time highly distraught over the tragic loss of his family.

18. In an attempt to coerce Mr. Hobley into confessing to starting the fire, a crime for which Mr. Hobley was completely innocent, Defendants Lotito and Dwyer proceeded to torture Mr. Hobley. Specifically, they beat Mr. Hobley, placed a plastic bag over his head until he suffocated and lost consciousness (a practice known in Area 2 and elsewhere as "bagging"), used racially offensive language, and made other threats as they repeatedly attempted to get Mr. Hobley to falsely confess to the arson and murders which he did not commit.

19. Despite the torture and abuse, at no time did Madison Hobley confess. Mr. Hobley refused to confess to any crimes because he did not commit any crimes.

20. Unable to coerce Mr. Hobley into confessing, the Defendant Officers created a false oral confession that they claimed he gave on the day of the fire.

21. The claim by the Defendant Officers that Mr. Hobley had confessed was a lie. In fact, the only written

5

documents created contemporaneously with the interrogation reflect nothing but Mr. Hobley's repeated denials.

22. Defendant Dwyer subsequently claimed that he had to throw away Mr. Hobley's "confession" because it was supposedly rendered illegible after coffee purportedly spilled on it.

### Additional Conspiratorial Acts

23. In furtherance of the conspiracy to frame Mr. Hobley and to support the phony "confession" which the Defendant Officers had supposedly secured, one or more of them conspired to plant physical evidence at the scene of the crime, to wit, they pretended to "find" a gas can at the scene of the fire.

24. In reality, this gas can had been confiscated in another, unrelated case some three weeks prior to the fire for which Mr. Hobley was wrongfully convicted. One or more of the Defendant Officers had removed the can from the Evidence and Recovered Property Section of the Chicago Police Department ("ERPS") and placed it at the scene of the crime where it was "discovered" some fourteen hours after the fire. Indeed, the gas can used to convict Mr. Hobley was clean, showing no signs that it had "survived" the blaze that destroyed Mr. Hobley's home: soot, plaster, heat damage, i.e., traditional evidence of fire and fire suppression, were absent from the can.

25. The Defendant Officers proceeded to conceal information indicating that the gasoline can introduced into evidence during Mr. Hobley's trial was not in fact used to start the fatal fire, but, rather, had been seized earlier at another

unrelated fire and planted on the scene in an attempt by Defendant Officers to implicate Mr. Hobley unjustly.

26. The Defendant Officers also deliberately withheld an exculpatory fingerprint report from testing conducted by the Chicago Police Department crime lab on the gasoline can.

27. In furtherance of the conspiracy to frame Mr. Hobley for crimes he did not commit, the Defendant Officers later produced two individuals who claimed to have seen Mr. Hobley purchase gasoline the night of the fire. One of the individuals could not be certain of his identification, and, only after persistent undue and improper coercion from the Defendant Officers, stated that perhaps Mr. Hobley (whom the Defendants showed him in a line-up) may have "favored" the man he saw purchase gasoline.

28. Long after he was convicted, Mr. Hobley also discovered that the second witness was being "helped" by the Defendant Officers with the witness' own criminal problems, including an arson that had occurred approximately six weeks later, committed in the same manner and within only a few blocks of Mr. Hobley's apartment building. The Defendant Officers, including Commander Jon Burge, thus provided assistance to the primary witness against Mr. Hobley in exchange for falsely implicating Mr. Hobley, and then proceeded to withhold this exculpatory information notwithstanding their knowledge that they had a duty to make it known to Mr. Hobley.

29. The Defendant Officers, including Defendant Garrity, also proceeded to falsely report that Mr. Hobley had

7

failed a polygraph examination, when in fact there is no evidence that Mr. Hobley had failed such an examination.

### Supervisory Liability

30. The constitutional injuries complained-of herein were proximately caused by a pattern and practice of misconduct which occurred with Defendants Burge's knowledge and consent in his supervisory capacity, such that Burge personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or else affirmatively turned a blind eye thereto without taking any steps to stop it.

31. In this way, Defendant Burge is personally responsible for the complained-of injuries because he knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or by his deliberately indifferent failure to act.

32. Independently, Defendant Burge is a supervisor who failed to stop misfeasor officers under his direction who had summarily tortured Plaintiff despite his knowledge of the same.

### Plaintiff's Wrongful Conviction

33. As a direct and proximate cause of the Defendant Officers' unlawful and deceitful actions, including making false claims of an alleged oral confession, planting of false evidence, tainting of witnesses (and withholding information about these circumstances), and withholding of exculpatory evidence, Plaintiff Madison Hobley was wrongfully convicted of arson and seven counts of murder, crimes he did not commit.

34. Thereafter, Mr. Hobley was sentenced to death. He then spent more than sixteen years in prison, over thirteen of which were on Death Row, before Governor Ryan granted him the above-described pardon based on his innocence in January 2003. In Governor Ryans' words: "The category of horrors was hard to believe. If I hadn't reviewed the case[] myself, I wouldn't believe it.... [This is a] perfect example[] of what is so terribly broken about our system."

### The City's Policy and Practice

35. This travesty of justice ran its course because the City of Chicago turned a blind eye to the wave of police corruption in Area 2 which gave rise to this and other wrongful convictions. In fact, Mr. Hobley was the victim of, and all of his injuries were proximately caused by, a policy and practice on the part of the City of Chicago which tolerated and even condoned the systematic deprivation of due process by members of Burge's now-infamous Area 2 team.

36. Specifically, throughout the 1980s, a group of Chicago Police Officers in Area 2 under the command of Defendant Burge engaged in systematic deprivation of due process in order to "solve" crimes more expediently and to enhance their personal standing in the Department. This reality was known to the command personnel, who themselves participated in the fabrication of confessions and other evidence.

37. The widespread policy and practice of deprivation of due process involved: concealing exculpatory information; "planting" evidence; witness manipulation; and, most importantly,

fabrication of incriminating evidence, including, but not limited to, the extraction of false confessions via coercion and torture.

38.   The methodology in Area 2 for depriving criminal suspects of due process of law by the means described in the preceding paragraph was disturbingly uniform:

a.   First, for any given crime, the Area 2 detectives would review the available evidence and select a particular suspect whom they felt might be guilty of that crime.

b.   Next, the Area 2 detectives would isolate that unfortunate suspect in an interrogation room in Area 2 headquarters and torture him during interrogation in an attempt to fabricate evidence, to wit, a coerced confession.  This torture included electric shocks administered to the testicles and other parts of the body from a small black box, electric shocks with what is now believed to be a cattle prod, suffocation to the point of unconsciousness with plastic bags and a typewriter cover, Russian roulette, burnings, severe beatings, and threats of death.

c.   If the Area 2 detectives were successful in extracting a confession via torture during interrogation, the case was closed on the basis of this fabricated evidence, and the suspect was prosecuted.  If the Area 2 detectives were unable to extract a confession via torture during interrogation, the detectives would nonetheless fabricate the existence of a false confession, the case was closed on the basis of this fabricated evidence, and the suspect was prosecuted.

d.    In all such cases, the detectives would seek to bolster the false confession (or the false non-confession) with other fabricated evidence which purportedly corroborated that confession.  This included, for example, "planting" physical evidence or deliberate manipulation of material witnesses.  These detectives furthered the objective of undermining due process by withholding exculpatory information, including the details associated with the practices described above.

39.    All told, there are up to one hundred known victims of this practice of depriving due process of law, though there may well be others.  At least thirteen of these individuals ended up on Death Row with Mr. Hobley.

40.    The following individuals were denied due process under Commander Burge's watch in Area 2, all of whom have testified under oath to the deprivations:

| | |
|---|---|
| a. | Andrew Wilson |
| b. | Alonzo Smith |
| c. | Jerry Mahaffey |
| d. | Reginald Mahaffey |
| e. | David Bates |
| f. | Gregory Banks |
| g. | Darrell Cannon |
| h. | Leonard Hinton |
| i. | Steven Bell |
| j. | Michael Tillman |
| k. | Stanley Howard |
| l. | Lavert Jones |
| m. | Derrick King |
| n. | Philip Adkins |
| o. | Walter Johnson |
| p. | Roy Wade Brown |
| q. | Donald White |
| r. | Melvin Jones |
| s. | Sylvester Green |
| t. | Shadeed Mu'min |
| u. | Aaron Patterson |
| v. | Andrew Maxwell |
| w. | Michael Coleman |

11

x.  Michael Johnson
y.  Eric Caine
z.  Gregory Howard

41.  In addition to the above-listed victims, the following individuals were also deprived of due process in the above-described manner by Area 2 police officers:

a.  Dwight Anthony
b.  Madison Brown
c.  Ronnie Bullock
d.  Hobley Collins
e.  Andre Coulter
f.  James Daniel
g.  Raymond Golden
h.  Anthony Hall
i.  Mozy Harris
j.  Roger Harris
k.  Terry Harris
l.  Anthony Holmes
m.  Lee Holmes
n.  Ronald Jackson
o.  Nora Jordan
p.  Leonard Kidd
q.  James Lewis
r.  Thomas Liss
s.  Derrick Martin
t.  Paul Mike
u.  Larry Milan
v.  Doris Miller
w.  Solomon Morgan
x.  Ronald Nash
y.  Lawrence Orange
z.  William Phillips
aa.  Alfonso Pinex
ab.  Willie Porch
ac.  Lawrence Poree
ad.  George Powell
ae.  Alvin Smith
af.  Willie Stokes
ag.  Perlie Sutckey
ah.  Timothy Thompson
ai.  Tony Thompson
aj.  Donnell Traylor
ak.  Leontine Wilbon
al.  Jackie Wilson
am.  Jesse Winston
an.  Cortez Brown
ao.  James Cody
ap.  James Andrews

42.  Each of Defendants Burge, Dwyer, Lotito, Mikus, McWeeney, Paladino, and Garrity in this case were involved in many of these other cases.  According to Chicago's own statistics, for example, Burge was named as an accused in 51% of the cases where the accused officers could be identified.

43.  With only one exception, all of the foregoing victims (98%) were African American.

44.  All of the accused police officers were white.

45.  The Illinois Supreme and Appellate Courts and the United States District Court have reversed convictions and/or ordered new hearings and trials on the basis of evidence of due process violations in, for instance, the following cases: People v. Wilson, 116 Ill. 2d 29 (1987); People v. Banks, 192 Ill. App. 3d 986 (1989); People v. Cannon, 293 Ill. App. 3d 694 (1997); People v. Patterson, 192 Ill. 2d 93 (2000); People v. Bates, 267 Ill. App. 3d 503 (1994); People v. King, 192 Ill. 2d 189 (2000); United States ex. rel. Maxwell v. Gilmore, 1999 WL 130331 (N.D.Ill. 1999).

46.  At least a dozen of these instances resulted in civil lawsuits.  In 1989, for example, in the case of Andrew Wilson v. City of Chicago, a federal jury concluded that "the City of Chicago had a de facto policy, practice or custom whereby Chicago police officers were allowed to physically abuse persons suspected of injuring or killing another Chicago police officer." On appeal of the Wilson case, Chicago itself characterized Burge's actions as "sadistic torture."

13

47.  As a Northern District of Illinois Judge observed in a written opinion ten years after <u>Wilson</u>: "It is now [by 1999] common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions.  Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis."

48.  Former Police Superintendent Richard Brzeczek, who was Superintendent when many of the torture allegations arose, recently told the *Chicago Tribune* that there is now "no doubt in [his] mind that Burge and his men tortured some suspects."

### Chicago's "Blind Eye"

49.  The due process violations described in the preceding paragraphs were allowed to take place because the City declined to implement any mechanism for oversight or punishment.

50.  In particular, the Department's system for disciplining police officers for violating due process in this manner is basically nonexistent.  During the time period at issue, the agency charged with investigating these allegations (O.P.S.) failed to investigate many of them.  For those which the O.P.S was forced to investigate, it rejected approximately 95% of all complaints of abuse, and the very few which were "sustained" were usually overturned on review such that no discipline was ever imposed.  The pattern described in this Paragraph continues unchanged to this day.

14

51. In 1987, then-Chief Administrator of O.P.S. David Fogel wrote a memo admitting that O.P.S. was a farce.

52. Specifically, the Fogel Memo admits that "the troops love O.P.S. . . . [It] actually operates to immunize police from internal discipline. . . and has institutionalized lying." Fogel's Memo explained that a substantial proportion of O.P.S.' investigators were thoroughly incompetent, part of a "politically corrupt heritage of pre-[Mayor Harold] Washington days."

53. Fogel's Memo concludes in part that: "O.P.S. gives the appearance of formal justice, but actually helps to institutionalize subterfuge and injustice."

54. With respect to the allegations of due process violations in Area 2, the O.P.S. initially found that each and every one of the allegations was groundless. Thus, at the time the allegations were first made, no Chicago police officer was deemed culpable, much less disciplined, for any of these allegations.

55. In addition to failing to discipline the offending officers internally, the Department also referred none of these allegations to the State's Attorney's Office for possible prosecution of the officers. This institutional unwillingness to refer police officers for prosecution was true throughout the relevant time period, and it continues through to the present.

56. In this way, Chicago police officers who violated the due process rights of criminal suspects by, *inter alia,* fabricating evidence regarding confessions, had every reason to know that they enjoyed *de facto* immunity from criminal

15

prosecution and/or Departmental discipline, thereby encouraging the very type of abuse at issue in this case.

### Suppression of Exculpatory Information

57.   In September 1990, an O.P.S. investigator named Goldston concluded a study of more than fifty allegations of constitutional violations in Area 2 through the mid-1980s; this investigation was based on review of cases one by one, and the data was compiled into a lengthy statistical analysis.

58.   The resulting Goldston Report dated September 28, 1990 (which was after Mr. Hobley was convicted but before his appeal was resolved) concluded that a "preponderance" of evidence dictated the conclusion that "systematic" and "methodical" abuse occurred over a ten year period, abuse which was "not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture."

59.   The Report also concluded that certain unnamed "[p]articular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end."

60.   With respect to Mr. Hobley's case, the Goldston Report constituted material exculpatory evidence which could have helped to exonerate him.  Because it documents dozens of similar examples of very similar abuses, Mr. Hobley could have used the evidence contained in the Report as part of his defense in his direct and post-conviction appeals.

61.   This exculpatory evidence is particularly compelling because although the allegations come from disparate

16

individuals with no connection to one another and no knowledge of each other's complaints, the allegations nonetheless exhibit uncanny similarity in terms of details such as, for instance, the seemingly improbable practice of suffocation by "bagging" experienced by Mr. Hobley.

62. Instead of disclosing the new exculpatory evidence to Mr. Hobley's defense, Former Police Superintendent Leroy Martin and O.P.S. Chief Administrator Gayle Shines suppressed the Goldston Report. In fact, for fifteen months, Martin and Shines kept the Report a secret and showed it to no one.

63. Then-Superintendent Martin was motivated to suppress the Goldston Report at least in part because he himself had headed Area 2 during some of the relevant time period, in which capacity he was Burge's direct supervisor.

64. During the fifteen months that Martin and Shines were suppressing the Goldston report, they also took no action at all regarding any of the allegations. Despite the evidence and conclusion that abuses during interrogations had been "methodical" and "systematic," no move was made to discipline any police officer, and the Report's contents were instead completely swept under the rug.

65. In 1992, district court Judge Milton I. Shadur unsealed (over Chicago's objections) the secret Goldston Report by court order, precipitating public disgrace for the Department.

### Still More Suppression of Exculpatory Materials

66. Less than half of the fifty examples of abuses cited in the Goldston Report had even been investigated

contemporaneously by O.P.S. Overall, only one of the fifty cases had resulted in a finding adverse to an accused police officer. Thus, with only one exception, the Department either conducted no investigation or cleared the accused in every one of these fifty due process violations.

67. In 1992, with public attention focused on suppressed accusations of police abuses after the Goldston Report came to light (as well as the initiation of proceedings to terminate Burge that same year), then-Superintendent Brzeczek publicly promised an investigation into allegations of police torture in Area 2.

68. To that end, nine of the allegations of were re-opened by O.P.S.

69. In most of these re-opened cases, the subsequent re-investigation reversed the original exonerations and instead "sustained" findings of wrongdoing on the part of the accused officers.

70. In spite of these new conclusions that certain police officers were guilty of fabricating false evidence via coercion during interrogations, the Department took no disciplinary action against any officer (many of whom were still on the force) except Burge.

71. Instead, approximately five years after the re-investigations found these allegations credible and recommended discipline, then-Police Superintendent Terry Hillard and his general counsel, Thomas Needham, made a secret decision to "shelve" all of these new O.P.S. findings.

72.  Specifically, in August 1998, Needham wrote a confidential Memo instructing O.P.S. to close all of the cases and to re-classify all of these newly "sustained" findings as "non-sustained," thereby clearing all of the officers.

73.  Although Needham subsequently claimed he had never really read the files and Hillard claimed he never even saw them, the authority to summarily reverse the sustained findings and close these cases without further investigation was vested exclusively in Mr. Hillard.  Under Chicago's policy, said action could only have been undertaken at Hillard's direction.

### Further Cover-Up/Withholding

74.  From 1992 through 1999 the Department and the Defendants with authority over these matters kept a secret of the new "sustained" findings and the related evidence supporting the victims such as Mr. Hobley.  This secret might have remained buried forever had it not been exposed involuntarily per court order in the course of a civil case against Chicago in mid-1999.

75.  In this way, for more than six years, Martin, Shines, Hillard, and Needham, acting in concert with the Defendants and others, all suppressed exculpatory evidence from Mr. Hobley and other victims who had been convicted based on fabricated confessions.  Instead of using this evidence to remedy the miscarriages of justice, these individuals first buried the evidence, then summarily nullified it, and then tried to conceal that decision as well.

76.  As a result of these actions, Mr. Hobley and the other victims faced execution without the benefit of the

19

knowledge/evidence that Chicago's investigators had subsequently corroborated their contentions that there were systematic due process violations and widespread fabrication of evidence taking place in Area 2. The reason the victims never learned this was because the Defendants improperly hid it from them.

77. In Mr. Hobley's case, this new evidence was all withheld from Mr. Hobley's criminal defense team for almost a decade as he continued to reside on Death Row litigating his post-conviction position in the courts. Had the information been provided to Mr. Hobley rather than suppressed, his post-conviction proceedings would have been resolved favorably to Mr. Hobley, and at a much earlier date than his pardon.

### Aftermath

78. Other than Burge, who was fired, and two other officers who merely served suspensions, Chicago has never disciplined any police officer for any of the allegations of fabricated confessions, including those officers who were subsequently adjudicated culpable after the re-investigations. Nor were any of the involved officers ever referred to the State's Attorneys' Office for prosecution, and some remain on the force to this day unpunished in any manner.

79. Even after Needham's secret Memo (reversing all of the sustained findings and closing the cases summarily) surfaced in 1999, the City, through Hillard and his spokeswoman, made clear that the Department was now finished with these allegations, and that no officer would ever be punished in the future. In a deposition in 1999, Hillard stated under oath in

20

his capacity as Chicago Police Superintendent that he "didn't know nothing" about the Goldston Report.

80. Burge is now retired in Florida; despite his termination for torturing people, is presently supported by approximately $30,000/year in pension by the City of Chicago.

## Mr. Hobley's Damages

81. Before he received his pardon on the basis of innocence last year, Mr. Hobley suffered enormously. After losing his family under the most tragic of circumstances, Mr. Hobley then had to bear the loss of his freedom and the almost-unimaginable indignities of prison and Death Row, all under the specter of an unjust death sentence.

82. If not for Governor Ryan's efforts to correct this injustice, Mr. Hobley might well have been electrocuted or poisoned by the State of Illinois by lethal injection for a crime he had nothing to do with, all as a result of Defendants' malfeasance in the manner described herein.

## Count I -- 42 U.S.C. § 1983

## Due Process

83. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

84. As described more fully above, each of the Defendants, while acting under color of law and within the scope of their employment as police officers, deprived Plaintiff of his constitutional right to a fair trial.

85. Each of the Defendant Officers deliberately withheld exculpatory evidence, as well as provided false

21

evidence, thereby misleading and misdirecting the state criminal prosecution of the Plaintiff. To wit, the Defendant Officers provided false allegations that were the basis of the criminal complaint, withheld exculpatory evidence throughout the proceedings, and fabricated evidence that was the bases of the criminal prosecution. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

86. Specifically, the Defendants concealed the fact that Plaintiff had never confessed as alleged by the prosecution at trial, assisted in tainting the testimony of the witnesses who testified against Plaintiff, assisted in planting the gas can, the physical evidence at the scene of the fire which was then used to convict Plaintiff, assisted in withholding evidence of witness manipulation, and/or assisted in withholding the exculpatory fingerprint report relating to said gas can. All of these Defendants then proceeded to conceal these facts from Plaintiff and the criminal court.

87. The Defendants used violence and torture against Plaintiff (or, alternatively, knew that violence and torture had been used against Plaintiff) to try to coerce him to confess falsely because those Defendants knew that Plaintiff was in fact innocent of the crime for which they were trying to frame him.

88. Additionally, these Defendants also conspired to conceal the fact that each of them had actual knowledge that torture had been used against Plaintiff during the interrogation session which supposedly produced what was subsequently claimed at his criminal trial to be a confession. The identities of

22

these particular officers who had actual knowledge that Plaintiff
had been tortured therefore constituted exculpatory information
withheld from the defense.  Moreover, Plaintiff did not know the
identity of any of the Defendants who had knowledge of this
torture other than those Defendants who were physically present
in the room at the time.

89.  The misconduct of the Defendant Officers also
resulted in the criminal conviction of Plaintiff, thereby denying
him his Constitutional right to a fair trial as it is secured to
Plaintiff in the Due Process Clause of the Fourteenth Amendment
of the United States Constitution.

90.  As a result of the violation of his constitutional
right to fair trial, Plaintiff suffered injuries, including but
not limited to emotional distress.

91.  The misconduct described in this Count was
objectively unreasonable and was undertaken intentionally with
willful indifference to Plaintiff's constitutional rights.

92.  The misconduct described in this Count was
undertaken pursuant to the policy and practice of the Chicago
Police Department in the manner described more fully above.

## COUNT II -- Section 1983

### False Arrest

93.  Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

94.  Plaintiff was improperly seized and arrested
without legitimate probable cause, to wit, Plaintiff was denied
liberty without justification in violation of the Constitution.

23

95. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff has suffered damages, including but not limited to substantial mental distress and anguish.

96. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

## Count III -- 42 U.S.C. § 1983

### Equal Protection

97. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

98. As described more fully above, the Defendant Officers, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff equal protection of the law in violation of his Constitutional rights.

99. Specifically, these Defendants actively participated in or personally caused misconduct in terms of "framing" minority criminal suspects in a manner designed to secure improper convictions. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

100. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress.

24

101. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

102. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

**COUNT IV -- Section 1983**

**Conspiracy to Deprive Plaintiff's Constitutional Rights**

103. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

104. Prior to the arrest of Plaintiff, the police personnel in Area 2 reached an agreement among themselves to violate the due process rights of criminal suspects in order to "close" as many cases as possible as fast as possible. This conspiracy involved an agreement to conceal exculpatory information, "plant" evidence, manipulate witnesses, and, most importantly, fabricate incriminating evidence, including but not limited to the extraction of false confessions via torture.

105. In furtherance of this illicit conspiracy to deprive criminal suspects of due process of law, personnel in Area 2 agreed to implement, and did in fact implement, the following agreed methodology on a widespread scale:

a.     First, it was agreed that for any given crime, the Area 2 detectives would select a particular suspect whom they felt might be guilty of that crime based on the evidence then available.

b.     Next, it was agreed that the Area 2 detectives would isolate that unfortunate suspect in an interrogation room in Area 2 headquarters and torture him during interrogation in an attempt to extract a confession.

c.     It was further agreed in advance that if the Area 2 detectives were able to extract a confession via torture during interrogation, the case would be closed on the basis of this fabricated evidence, and the suspect would be prosecuted. On the other hand, if the detectives were unable to extract a confession via torture during interrogation, it was agreed in advance that the detectives would simply fabricate that piece of evidence (i.e., the existence of a confession), and the case was closed and the suspect prosecuted on the basis of this fabricated evidence.

d.     In all such cases, it was agreed that the detectives would seek to bolster the false confession (or the false non-confession) with other fabricated evidence which purportedly corroborated that confession. This included, for example, "planting" physical evidence or deliberate manipulation of material witnesses. These detectives further agreed to advance the objective of undermining due process by withholding exculpatory information, including the details associated with the practices described above.

106. Based on the evidence now available, the agreed methodology described above played out at least one hundred times in Area 2. In addition to the individuals described above, one such victim of this reoccurring and ongoing conspiracy to violate due process was Mr. Hobley.

107. In particular, after the fire at issue in Plaintiff's case, Defendants Burge, Lotito, Dwyer, Paladino, Garrity, and Mikus all implemented the illicit agreed-plan described above. In this way, the Defendant Officers conspired, and continue to conspire, to deprive Plaintiff of his constitutional rights to be free of violations of due process, false arrest and malicious prosecution as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

108. Specifically, Defendants Burge, Lotito, Dwyer, Paladino, Garrity, Mikus and Paladino, as well as some of the other Officers in Area 2, reached an agreement to attempt to extract a false confession via torture, then, having failed, to conceal the fact that Plaintiff had never confessed to the murders as alleged by the prosecution at the criminal trial, as well as the additional fact that Plaintiff had not failed a polygraph as reported by Defendant Garrity.

109. Defendants Burge, Lotito, Dwyer, Paladino, Garrity, Mikus and Paladino, as well as some of the other Officers in Area 2, also reached an agreement either to assist in tainting the testimony of the witnesses who testified against Plaintiff or else to assist in planting the gas can, the physical evidence at the scene of the fire which was then used to convict

27

Plaintiff; all of these Defendants then proceeded to agree to conceal all of these facts, as well as the exculpatory fingerprint report, from Plaintiff and the criminal court.

110. Additionally, these Defendants also conspired to conceal the fact that each of them had actual knowledge that torture had been used against Plaintiff during the interrogation session which supposedly produced what was subsequently claimed at his criminal trial to be a confession. The identities of these particular officers who had actual knowledge that Plaintiff had been tortured therefore constituted exculpatory information withheld from the defense, and Plaintiff did not then know the identity of any of these Defendants who had knowledge of this torture other than those Defendants who were physically present in the room at the time.

111. Police Superintendents Leroy Martin and Terry Hillard, Chief Administrator of Chicago's Office of Professional Standards Gayle Shines and attorney Thomas Needham, as well as the other Defendants and other unnamed co-conspirators, also contributed to this conspiracy to deprive Plaintiff's constitutional rights. They did so by intentionally concealing exculpatory information which would have enabled Plaintiff to successfully challenge his conviction and obtain a new trial had that information not been suppressed, to wit, these individuals concealed the existence of the Goldston report and other exculpatory materials which would have helped to exonerate Plaintiff had they not been suppressed.

112. In the manner described in the preceding paragraphs, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

113. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. One such overt act was the physical torture of Plaintiff; in fact, a conspiracy to commit violence continues to this day because overt acts in support of this conspiracy have continued unabated to the present.

114. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

115. As a proximate result of the conspiracy, Plaintiff suffered financial damage, as well as severe emotional distress.

116. This conspiracy was undertaken for the additional purpose of punishing Plaintiff for exercising his First Amendment right to speak out about matters of public concern, namely, the police abuses described above.

117. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described more fully in preceding paragraphs.

### COUNT V -- Section 1983

### Conspiracy With O.P.S. to Deprive Constitutional Rights

118. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

29

119. Prior to date of the constitutional injuries suffered by Plaintiff in this case, it was agreed among the police officer Defendants, on the one hand, and the individuals who comprise the Office of Professional Standards on the other hand, that if any members of the Chicago Police Department were subsequently accused by citizens of due process violations, then the O.P.S. employees, including the aforementioned investigators, would either take no action to investigate or, if investigation was unavoidable, actively endeavor to deem those citizen complaints unfounded or unsustained, even where they knew that the police officers in fact violated citizens' rights (hereafter, the "Agreement").

120. In furtherance of this illicit Agreement, it was further agreed among the Defendant police officer on the one hand, and the individuals who comprise the O.P.S. on the other hand, that if a due process complaint were to arise, then the O.P.S. would deliberately avoid interviewing the accused police officers (contrary to the written policy on the books which should have required such an interview) until after the victim was prosecuted and convicted. This Agreement, which facilitated the abuse at issue by insulating rogue police officers from scrutiny, was carried out in numerous cases over the years, including Plaintiff's case, in which the O.P.S. repeatedly and deliberately kept deferring an interview of the Defendant Officers about Plaintiff's allegations month after month for the entire period of years it took to obtain his conviction.

121. It was further agreed by the above-named conspirators that when the Goldston report and other similar evidence subsequently arose, it would be (and was) suppressed.

122. At all relevant times, the Agreement referenced in the preceding four paragraphs was the policy and practice of the Chicago Police Department, and was tacitly ratified by policy-makers for the City of Chicago with final policymaking authority.

123. As a direct and proximate result of the illicit prior Agreement described above, Plaintiff's rights were violated.

124. Specifically, Plaintiff was subjected to violation of his due process rights and other constitutional injuries as a direct result of the Agreement with O.P.S. employees to decline to sustain citizen complaints even where meritorious. Because of this Agreement, the Defendants were encouraged to believe they could act with impunity and without fear of any repercussions, even where they purposefully violated the rights of criminal suspects. In this manner, the alleged Agreement proximately caused all of the injuries suffered by Plaintiff in this case.

125. In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

126. Independently, before and after Plaintiff's conviction, each of the Defendants further conspired, and continue to conspire, to deprive Plaintiff of exculpatory

31

led to his exonerated of the false charges as described in the various Paragraphs of this Complaint.

127. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. One such overt act was the suppression of the Goldston report. Another overt act is the continued suppression of material documents in the current litigation, a problem which continues to this day.

128. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

129. As a proximate result of the conspiracy, Plaintiff suffered financial damage, as well as severe emotional distress.

130. This conspiracy was undertaken for the additional purpose of punishing Plaintiff for exercising his First Amendment right to speak out about matters of public concern, namely, about the police abuses described above.

131. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described more fully in preceding paragraphs.

## COUNT VI -- Section 1985(3) Conspiracy
## Conspiracy to Deprive Constitutional Rights

132. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

133. As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

32

134. In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiff.

135. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

136. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

### Count VII -- R.I.C.O.

137. Plaintiff incorporates all of the paragraphs of this Complaint as if fully set forth herein.

138. Over the course of years, each of the individual Defendants have conducted, and continue to conduct, racketeering activity through their positions as agents of the Chicago Police Department and other law enforcement agencies in a manner that has caused harm to Plaintiff's business and property.

139. Specifically, these Defendants have associated with an enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. Each individual Defendant played some part in directing those affairs.

140. The racketeering activity referred to in the preceding paragraphs satisfies the conduct requirement in that it includes the provision of false documents, fabricated evidence, and the false testimony of others to the State's Attorneys' Office, which then used this information to prosecute Plaintiff

33

and others. In so doing, Defendants directed these criminal investigations in their official positions with the Department.

141. The Chicago Police Department is an enterprise as defined under 18 U.S.C. § 1961, which is engaged in and affects interstate commerce.

142. The racketeering activity referred to in the preceding paragraphs includes, at a minimum, at least two predicate acts with the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

143. The predicate acts referred to in the preceding paragraphs include, among others, the Defendants' actions in framing Plaintiff and others for murder. This includes but is not limited to using their official positions to obstruct state and local criminal investigations, commit perjury, tamper with witnesses (including the inducement of witnesses to give false statements), and otherwise cover up their misconduct in working to obstruct justice and procure false convictions.

144. RICO's continuity element is satisfied here in the manner described more fully above in that Defendants engaged in a series of related attempts to fabricate evidence and otherwise frame criminal suspects and to thwart attempts to overturn their wrongful convictions over a substantial period of time (close-ended continuity) and because the Defendants' misconduct, by its nature, projects into the future with a threat of repetition (open-ended continuity), including but not limited to the still-

34

continuing conspiracy to avoid prosecution for their misdeeds and the suppression of evidence and false statements made in discovery responses in this case.

145. The Defendants have engaged in a long-standing pattern of racketeering activity that continues to this day. The acts comprising this racketeering activity are related to each other and pose a threat of continued criminal activity, as demonstrated, *inter alia,* by the repeated nature of the malfeasance described above and the more than 100 victims known to date.

146. As a result of Defendants' conduct, Plaintiff has suffered injuries to his business and/or property. Specifically, Plaintiff suffered a loss of business reputation and damage to his then-existing business opportunities, was forced to pay legal fees, and lost bond money, as well as interest and fees on that bond money, all as a direct and proximate result of Defendants' racketeering activity.

147. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and indifference to the rights of others.

148. The misconduct described herein proximately caused Plaintiff injuries for which he is entitled to treble damages.

149. The misconduct in this Count was undertaken by Defendants within the scope of their employment and under color of law such that their employers are liable for their actions.

### Count VIII - RICO Conspiracy

150. Plaintiff incorporates all of the paragraphs of this Complaint as if fully set forth herein.

35

151. As described more fully above, each of the individual Defendants in this action agreed, impliedly or directly, to participate in framing Plaintiff for crimes he did not commit. These Defendants agreed, impliedly or directly, that some of them would commit a pattern of racketeering activity in order to harm Plaintiff, and then took actions in furtherance of that common objective.

152. As a result of Defendants' conduct, Plaintiff has suffered injuries to his business and/or property. Specifically, Plaintiff has had to pay legal fees, suffered a loss of business reputation, and lost bond money, as well as interest and fees on that bond money, as a direct and proximate result of Defendants' racketeering activity.

153. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of others.

154. The misconduct described in this Count was undertaken by Defendants within the scope of their employment and under color of law such that their employers are liable for their actions.

### Count IX -- 42 U.S.C. § 1983

### Police Torture

155. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

156. As described above, Defendants Dwyer and Lotito beat Madison Hobley and placed a plastic typewriter cover over

36

his head, intentionally causing Plaintiff to suffocate while other Defendants looked on without intervening.

157. Although Plaintiff never actually succumbed to the torture, the Defendants falsely claimed that he did, to wit, they invented a purported "confession" which they then provided to the prosecutors. This alleged confession was introduced at trial against Plaintiff, and was a decisive piece of "evidence" leading to his conviction.

158. As a result of Defendants Dwyer and Lotito's unjustified and excessive use of force, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages.

159. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

160. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## Count X -- 42 U.S.C. § 1983
### Failure to Intervene to Prevent Constitutional Violations

161. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

162. During the violations of Plaintiff's rights described more fully above, each of the Defendants stood by without intervening to prevent those violations of Plaintiff's rights.

37

163. As a result of the Defendants' failure to intervene to prevent these violations of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

164. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

165. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described in preceding paragraphs.

### Count IX -- Section 1983
### Monell Claim

166. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

167. All of the constitutional violations described in this Complaint were undertaken pursuant to the policy and practice of the City of Chicago (all in the manner described more fully above in prior sections of this Complaint) in that:

a. As a matter of both policy and practice, the Chicago Police Department directly encouraged, and was thereby the moving force behind, the very type of constitutional violation at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

38

b. As a matter of both policy and practice, the Department facilitates the very type of constitutional violation at issue here by failing to adequately punish and discipline prior instances of misconduct, including "repeater" offenders who exhibit patterns of abuse, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff;

c. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Department violated the constitutional rights of citizens in a manner similar to that alleged by Plaintiff on a frequent basis, all with the knowledge and acquiescence of supervisory and command personnel, yet the Department makes findings of wrongdoing in a disproportionately small number of cases;

d. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, the Department refuses to refer police officers for prosecution even when they commit violent crimes such that said officers are encouraged to believe they enjoy *de facto* immunity from criminal prosecution.

e. Plaintiff's injuries were also caused by the policies and practices on the part of the City of Chicago of suppressing exculpatory <u>Brady</u> materials and improperly refusing to create exculpatory <u>Brady</u> materials.

f. Plaintiff's injuries were also caused by the policies and practices of endeavoring to coerce confessions, failing to video tape interrogations, and the systematic

39

fabrication of evidence, including false police reports, all designed to encourage prosecutions and secure convictions regardless of actual guilt or innocence.

g. Municipal policy-makers and Department supervisors are aware of (and condone and facilitate by their inaction) a "code of silence" in the Chicago Police Department, by which officers fail to report and otherwise lie about misconduct committed by other officers, such as the misconduct at issue in this case; and

h. The City of Chicago failed to timely act to remedy the patterns of abuse described in the preceding sub-paragraphs, despite actual knowledge of the same, thereby ratifying the unlawful practices and causing the types of injuries described herein.

168. Additionally, the unconstitutional withholding of exculpatory information from Plaintiffs' defense in this case, as well as the subsequent destruction of some of the same, was all undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Chicago Police Department, including the Defendants in this action, to systematically suppress Brady material by intentionally secreting discoverable information in so-called "street files." As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the State's Attorney's Office and from criminal defendants and were subsequently destroyed.

169. Consistent with the municipal policy and practice described in the preceding paragraphs, Defendants in this case

40

concealed exculpatory evidence within street files which were never disclosed to Plaintiffs' criminal defense teams and which have since been destroyed. This withholding and destruction of evidence which would have exonerated Plaintiffs was undertaken pursuant to the City's policy and practice in the manner described above.

170. Another policy and practice which proximately caused Plaintiff's injuries was the flawed administration of evidence in the ERPS, all as described above. In particular, those lax policies and practices enabled and even encouraged Chicago Police Officers to believe they could take evidence out of ERPS and "plant it" at crime scenes with total impunity.

171. All of the policies and practices described in the foregoing paragraphs were consciously approved at the highest policy-making level for decisions involving the Police Department, and were a proximate cause of the injuries suffered here by Plaintiff. On the basis of all of the foregoing, the City of Chicago is liable to Plaintiff for his injuries.

### COUNT XII -- State Law Claim

### Intentional Infliction of Emotional Distress

172. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

173. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

41

174. Said actions and conduct did directly and proximately cause severe emotional distress to Plaintiff and thereby constituted intentional infliction of emotional distress.

175. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

176. As a proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.

## COUNT XIII -- State Law Claim
## Civil Conspiracy

177. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

178. As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

179. As described more fully in the preceding paragraphs, the complained-of conspiracy included among its objectives a conspiracy to maliciously prosecute and a conspiracy to inflict emotional distress via police torture, said conspiracies having been carried out on innumerable occasions before the torture experienced by Plaintiff in this case.

180. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity. Among these overt acts were the torture of

42

Plaintiff, as well as the torture of all of the other victims of this practice.

181. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

182. As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish.

## COUNT XIV -- State Law Claim
## Malicious Prosecution

183. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

184. Plaintiff was improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of innocence.

185. The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

186. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that the statements were false and perjured. In so doing, Defendant Officers fabricated evidence and withheld exculpatory information.

187. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

188. As a result of this misconduct, Plaintiff has suffered and continues to suffer injuries including pain and suffering.

### COUNT XV - State Law Claim
### Respondeat Superior

189. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

190. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of their employment.

191. Defendant City of Chicago is liable as principal for all torts committed by its agents.

### COUNT XVI - State Law Claim
### Indemnification

192. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

193. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

194. The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

44

WHEREFORE, Plaintiff, MADISON HOBLEY, respectfully requests that this Court enter judgment in his favor and against Defendants, JON BURGE, ROBERT DWYER, JAMES LOTITO, DANIEL McWEENEY, JOHN PALADINO, VIRGIL MIKUS, PATRICK GARRITY, and the CITY OF CHICAGO, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the Defendant Officers in their individual capacities and treble damages under the R.I.C.O. statute, as well as any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, MADISON HOBLEY, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

Arthur Loevy
Jon Loevy
Michael Kanovitz
Kurt Feuer
Jon Rosenblatt
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

Professor Andrea D. Lyon
The Center for Justice in Capital Cases
    of the DePaul College of Law
25 East Jackson Blvd.
Chicago, IL 60604