# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin E. Aspen | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3678 | **DATE** | 9/16/2004 |
| **CASE TITLE** | Madison Hobley vs. Jon Burge, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____ .
(3) ☐ Answer brief to motion due _____ . Reply to answer brief due_____ .
(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(7) ☐ Trial[set for/re-set for] on _____ at _____ .
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, the Motion of John Conroy and Chicago Reader, Inc., to Quash Subpoena and for Entry of Protective Order [150] is GRANTED IN PART, DENIED IN PART, and STRICKEN AS MOOT IN PART. The subpoena directed to the Movants is modified to require production only of Madison Hobley's three letters to John Conroy. Enter Memorandum Opinion and Order. /s/ Geraldine Soat Brown

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| ✓ | Copy to judge/magistrate judge. |

courtroom deputy's initials: GR

Date/time received in central Clerk's Office

number of notices
SEP 17 2004 date docketed
rbf docketing deputy initials
9/16/2004 date mailed notice
GR mailing deputy initials

Document Number: 315

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MADISON HOBLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) Case No. 03 C 3678 |
| v. | ) |
| | ) **Judge Marvin Aspen** |
| **CHICAGO POLICE COMMANDER** | ) **Magistrate Judge Geraldine Soat Brown** |
| **JON BURGE, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Non-parties John Conroy ("Conroy") and Chicago Reader, Inc. ("Chicago Reader") (collectively, the "Movants") filed a motion to quash the subpoena *duces tecum* served upon them by defendants Jon Burge, Robert Dwyer, James Lotito, Virgil Mikus, Daniel McWeeny, John Paladino and Patrick Garrity (collectively, the "Individual Defendants") and for the entry of a protective order. [Dkt 150.][1] That motion was referred to this court by the District Judge. [Dkt 151.] For the following reasons, the motion filed by Conroy and Chicago Reader is granted in part, denied

---

[1] The Motion of John Conroy and Chicago Reader, Inc. To Quash Subpoena and For Entry of Protective Order is cited herein as "Mot." The Response in Opposition to the Motion to Quash Subpoena and For Entry of Protective Order is cited herein as "Resp. Opp'n Mot. Quash." [Dkt 176.] The Reply Brief of John Conroy and Chicago Reader, Inc. In Support of Motion to Quash and For Entry of Protective Order is cited herein as "Reply." [Dkt 193.] The Corrected Supplemental Brief of John Conroy and Chicago Reader, Inc. In Support of Motion to Quash Subpoena and For Entry of Protective Order is cited herein as "Suppl. Br." [Dkt 236.] The Response in Opposition to Supplemental Brief of John Conroy and the Chicago Reader In Support of Motion to Quash Subpoena and For Entry of Protective Order is cited herein as "Resp. Opp'n Suppl. Br." [Dkt 256.]

1



in part, and stricken in part as moot.

## RELEVANT FACTS

Conroy is a newspaper journalist employed as a staff writer by Chicago Reader, the publisher of the *Reader*, a weekly newspaper of general circulation. (Mot. ¶¶ 1-2.) For fifteen years, Conroy has investigated and written numerous articles regarding alleged police brutality, coerced confessions and wrongful convictions, particularly of Area 2 detainees. (Mot. ¶ 3.) Nearly all of those articles were published in the *Reader*. (*Id.*) According to the Individual Defendants, the published articles "have been a driving force behind the allegations of widespread abuse and torture of Area 2 detainees." (Resp. Opp'n Mot. Quash at 1.) In some of those articles, Conroy discussed the torture allegations made by plaintiff Madison Hobley ("Hobley") and certain aspects of his criminal case. (Mot. ¶ 4-5; Resp. Opp'n Mot. Quash at 4-5.)

According to Conroy, his contact with Hobley began in December 1990. (Mot., Ex. D, John Conroy Aff. ¶ 33.) After he wrote an article covering the civil trials of Andrew Wilson, which was published in January 1990, Conroy began receiving letters and phone calls from incarcerated men who claimed that they were tortured at Area 2. (Resp. Opp'n Mot. Quash at 2-3; Conroy Aff. ¶ 2, 6.) One of those men was Hobley, who sent Conroy an "introductory letter" in 1990. (Conroy Suppl. Aff. ¶ 7.) Conroy investigated those allegations in the years that followed. (Conroy Aff. ¶ 6.)

On April 16, 1991, Conroy met with Hobley in a penitentiary in Pontiac, Illinois. (Conroy Suppl. Aff. ¶ 1.) Although he made no electronic recording of that meeting, Conroy took two pages of handwritten notes. (*Id.* ¶ 2.) At the time of that meeting, Hobley was in the middle of a gap in his legal representation; he was waiting for new counsel to be appointed. (*Id.* ¶ 3.) Conroy claims that,

2

in light of Hobley's lack of counsel, he and Hobley agreed that Conroy "would not disclose or publish the information [Hobley] provided until and unless his new attorneys gave their approval." (*Id.*) New counsel was appointed on June 4, 1991. (*Id.*) However, according to Conroy, he has never received authorization from Hobley, any attorney, or any other person to publish the information that Hobley provided to him and, as a result, he has not disclosed or published the information he acquired at that meeting with Hobley. (*Id.* ¶ 4.) About a month after their meeting, but prior to counsel being appointed, Hobley sent Conroy another letter. (Conroy Suppl. Aff. ¶ 7.)

Conroy subsequently wrote two articles concerning Hobley. (Conroy Suppl. Aff. ¶ 5.) According to Conroy, neither of those articles contain any references to his meeting or conversations with Hobley or to any letters that he received from Hobley. (*Id.*) The first article, entitled "Town Without Pity," was published by Chicago Reader on January 12, 1996 and explains the history of the torture allegations and highlights, among others, the case of Madison Hobley. (Conroy Aff. ¶ 7; Mot., Ex. A, "Town Without Pity".) Shortly after the publication of that article, Conroy had a brief telephone conversation with Hobley, during which Conroy took handwritten notes consisting of 137 words spread over 29 lines. (Conroy Suppl. Aff. ¶ 6.) Conroy claims that, during that telephone conversation, he and Hobley did not discuss the fire, arrest, interrogation, trial, conviction or sentence. (*Id.*)

The second article, entitled "This Is A Magic Can," was published by Chicago Reader on May 26, 2000. (Conroy Aff. ¶¶ 17-19; Mot., Ex. B, "This Is A Magic Can".) In that article, Conroy gave a detailed account of Hobley's arrest, trial, conviction, and death sentence. (*Id.*) Conroy received a third letter from Hobley, but it is unclear when that letter was sent. (Conroy Suppl. Aff. ¶ 7.) In his supplemental affidavit, Conroy states that a final letter was sent to him in January 1996,

3

following publication of "This Is A Magic Can." (Conroy Suppl. Aff. ¶ 7.) However, "This Is A Magic Can" was published on May 26, 2000; "Town Without Pity" was published in January 1996. (Conroy Suppl. Aff. ¶ 17; Conroy Aff. ¶ 7.) Conroy also stated that he has an undated note consisting of 24 words in shorthand and cursive that he wrote during a phone conversation about Hobley, but he cannot recall with whom he was speaking when he took those notes. (Conroy Suppl. Aff. ¶ 8.) Until now, Conroy has never publicly mentioned that he spoke to or corresponded with Hobley. (*Id.* ¶ 5.)

It is undisputed that Chicago Reader's publication of Conroy's articles concerning claims that suspects had been tortured by Chicago Police was instrumental in drawing both public and official attention to those allegations. (Conroy Aff. ¶ 3; Resp. Opp'n Mot. Quash at 2-3.) The Individual Defendants acknowledge that two months after the House of Screams appeared in the *Reader*, the Chicago Police Department's Office of Professional Standards began an official investigation into the allegations, which lead ultimately to the dismissal of defendant Jon Burge from the Chicago Police Department. (Resp. Opp'n Motion Quash at 2-3.) The report resulting from that investigation (commonly called the "Goldston Report") cited House of Screams as a "sound starting point" for the investigation. (*Id.*, Resp. Opp'n Mot. Quash, Ex. C at 1.)

## PROCEDURAL BACKGROUND

In December 2003, Hobley's counsel served Defendants with plaintiff's initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). (Resp. Opp'n Mot. Quash, Ex. A, Rule 26(a)(1) Disclosures.) In those disclosures, Hobley's counsel identified Conroy as an individual "likely to have discoverable information that [he] may use to support [his claims] . . ." (Rule 26(a)(1) Disclosures

4

at 1, 5.) Plaintiff's disclosures also listed a number of individuals who were the subject of articles written by Conroy. (*Id.* at 4-5.)

Based on plaintiff's Rule 26(a)(1) Disclosures, the Individual Defendants caused a subpoena *duces tecum* to be served on Conroy and Chicago Reader. The subpoena sought the following:

> Any and all documents, including but not limited to reports, notes and correspondence; video, audio or data recordings; photographs; or electronic media regarding Madison Hobley and/or the arson fire that occurred on January 6, 1987 at an apartment building located at 1121-1123 East 82nd Street, Chicago.

(Resp. Opp'n Mot. Quash at 5; Mot., Ex. C., Subpoena).

On April 5, 2004, Conroy and Chicago Reader filed the present motion under Federal Rules of Civil Procedure 45(c)(3)(A) and 26(c) to quash the subpoena and to protect them from compelled disclosure of all sources, information and documents sought by the subpoena including, in particular, those that are confidential. (Mot. at 1, 9-10.) In support of their motion, Conroy and Chicago Reader asserted, *inter alia*, that the information sought by the subpoena is protected by a qualified reporter's privilege or, in the alternative, the subpoena is not reasonable in the circumstances. (Mot. at 5-6, 8-9.)

The Individual Defendants filed a response in opposition to that motion but, at the same time, narrowed the scope of their request. Specifically, the Individual Defendants excluded from their request information that was obtained by Conroy from *known* individuals to whom he promised confidentiality in exchange for their information. (Resp. Opp'n Mot. Quash at 7.) The Individual Defendants agreed that the such information "should be protected from disclosure at this juncture." (*Id.*)

A hearing was held on Conroy and Chicago Reader's motion on June 3, 2004. (Resp. Opp'n

5

Suppl. Br., Ex. A, June 3, 2004 Transcript ("Tr.").) During the hearing, counsel for the Individual Defendants tacitly admitted that the original subpoena they served on the Movants was overly broad. (*Id.* at 41-42.) In fact, counsel for the Individual Defendants immediately agreed to narrow the scope of the subpoena even more, stating that they were not seeking secondary sources (*e.g.*, transcripts from court proceedings).[2] As the hearing continued, however, it became apparent that the Individual Defendants were only interested in a very small subset of information sought by the original subpoena. Counsel for the Individual Defendants stated that they wanted, for impeachment purposes, any statements Hobley made to Conroy relating to the fire that occurred on January 6, 1987.[3] (*Id.* at 43-45.) Because counsel for the Individual Defendants did not attempt to justify any other categories of information sought by the original subpoena and, in fact, explicitly stated that the Individual Defendants were willing to "concede on the other issues" (*Id.* at 59), the question now before this court is whether Conroy should be required to produce any statements Hobley made to him relating to the fire that occurred on January 6, 1987. To the extent Conroy and Chicago Reader's motion sought to quash any information sought by the original subpoena beyond that limited category, the motion is moot.

---

[2] When asked by the court why the subpoena was not drafted more narrowly in the first place, counsel for the Individual Defendants referred to the fact that Hobley had listed Conroy as a potential witness. (*Id.* at 42.) The Individual Defendants' counsel also stated that Hobley has subsequently agreed not to call Conroy as a witness at trial, and thus, the scope of what the Individual Defendants are seeking is narrower. (*Id.*) Counsel for the Movants also indicated that Hobley has agreed not to call Conroy at trial. (*Id.* at 50.) Because Hobley's counsel was present in the courtroom during the hearing and did not object to those statements, the court understands that Conroy will not be called as a witness at the trial.

[3] Although one attorney for the Individual Defendants stated that they also wanted statements made to Conroy by any other witnesses (*e.g.*, Robin Hobley or Myra Hobley) (Tr. 45), another attorney representing the Individual Defendants later agreed to concede on that issue. (Tr. 59).

6

Pursuant to the court's request (Tr. 59-60), the parties submitted supplemental briefs on the limited issue of whether a subpoena seeking only statements Hobley made to Conroy is enforceable. (Suppl. Br.; Resp. Opp'n Suppl. Br.) For the reasons set forth below, the court finds that the subpoena is enforceable to the extent it seeks the letters sent by Hobley to Conroy, and the motion to quash is denied with respect to those letters. Except to the extent that the motion is moot, the motion is otherwise granted, including with respect to any notes taken by Conroy of conversations with or about Hobley.

## DISCUSSION

Rule 45(c) of the Federal Rules of Civil Procedure provides protection for persons subject to subpoenas. Under Rule 45(c)(3), a court must quash or modify a subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies." Fed. R. Civ. P. 45(c)(3)(A)(iii). Conroy and Chicago Reader initially argue that the subpoena should be quashed because the information sought is protected by a qualified reporter's privilege. (Mot. at 4-5.) However, in *McKevitt v. Pallasch*, 339 F.3d 530, 532-33 (7th Cir. 2003), the Seventh Circuit specifically rejected the argument that the First Amendment provides journalists special protection against subpoenas, at least with respect to information from non-confidential sources. The Movants argue that the decision in *McKevitt* was wrongly decided, and ask the court to look to the reasoning in cases such as *Neal v. City of Harvey*, 173 F.R.D. 231 (N.D. Ill. 1997), and *Gulliver's Periodicals, Ltd. v. Chas Levy Circulating Co., Inc.*, 455 F. Supp. 1197 (N.D. Ill. 1978). (Reply at 3 n. 3.) However, the decision in *McKevitt* is the law in this Circuit, which this court is bound to follow.

The facts in *McKevitt*, however, are different from the situation here. In *McKevitt*, three

7

Chicago journalists were ordered to produce tape recordings of their interviews with an FBI informant, David Rupert, who was the main witness in an Irish terrorism prosecution against Michael McKevitt. 339 F.3d at 531. The three journalists had tape recorded interviews with Rupert in connection with a book they were writing about Rupert's experiences spying on the Irish Republican Army. *Id.* McKevitt's lawyers sought access to the tape recordings in preparation for their cross-examination of Rupert at trial. *Id.* The journalists objected on the basis of the federal common law reporter's privilege. *Id.* Significantly, however, Rupert, the source, did not object to the disclosure of the tapes to McKevitt's counsel. *Id.* at 532. The district court, pursuant to 28 U.S.C. § 1782 (which allows a district court to order the production of evidence for use in foreign legal proceedings if the materials are not privileged), ordered the journalists to produce the tapes, finding that the privilege had been overcome. *Id.* at 531. However, shortly before the deadline for production of the interview tapes, the journalists appealed to the Seventh Circuit and moved for a stay. *Id.* The Seventh Circuit denied the journalists' motion for stay and dismissed the appeal as moot. *Id.* at 535. Later, the Court issued an opinion explaining its decision. *McKevitt*, 339 F.3d 530.

After reviewing the decision of *Branzburg v. Hayes*, 408 U.S. 665 (1972), the Seventh Circuit remarked that interpretations of that landmark case led most courts of appeal to conclude, "rather surprisingly," that there is a reporter's privilege, despite the lack of agreement on its scope. *McKevitt*, 339 F.3d at 532. The Seventh Circuit's reading of *Branzburg* was far less expansive. Although the Seventh Circuit indicated a willingness to provide First Amendment protection to information from confidential sources, it reasoned that when the information came from a non-confidential source, First Amendment concerns were not implicated. *Id.* at 533. In articulating the

standard to be applied, the Seventh Circuit stated:

> It seems to us that rather than speaking of privilege, courts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is *reasonable in the circumstances*, which is the general criterion for judicial review of subpoenas. . . . We do not see why there need to be a special criteria merely because the possessor of the documents or other evidence sought is a journalist.

339 F.3d at 533 (emphasis added) (citations omitted).

At least one court in this District has found, based on *McKevitt*, that information obtained by a reporter from a confidential source is entitled to First Amendment protection. In *Solaia Technology, LLC v. Rockwell Automation, Inc.*, No. 03 C 6904, 2003 WL 22597611 at *1 (N.D. Ill. 2003) (Lefkow, J.), a non-party publishing company filed a motion to quash a subpoena *duces tecum* served on it by the plaintiff. The court, citing *McKevitt*, agreed to quash the subpoena to the extent it sought disclosure of information from confidential sources (*e.g.*, an anonymously published letter and any documents related thereto). *Solaia*, 2003 WL 22597611 at *2. However, the court in *Solaia Technology* was unwilling to protect taped and written communications between the publishing company and the defendants, finding that they were not confidential because the sources were known. *Id*. The court went on to explain: "This information is not from a confidential source and would not be protected under the First Amendment, nor can any subpoena duces tecum requesting disclosure of such information be viewed as unreasonable."[4] *Id*.

Citing *McKevitt* and *Solaia*, the Movants argue that Conroy's handwritten notes of his

---

[4] In this case, the Individual Defendants have already conceded that they are not entitled to information from confidential sources, although they define that term differently than the court in *Solaia Technology*. The Individual Defendants agree that they were not entitled to "information from *known* individuals to whom Conroy promised confidentiality in exchange for their information." (Resp. Opp'n Mot. Quash at 7.)

9

conversations with Hobley are "shielded from compulsory production" because they were made pursuant to a "confidentiality agreement." (Suppl. Brief at 7-8.) According to Conroy's affidavit, Conroy and Hobley agreed, at the April 16, 1991 meeting in the penitentiary, that Conroy "would not disclose or publish the information [Hobley] provided until and unless his new attorneys gave their approval." (Conroy Suppl. Aff. ¶ 1, 3.) However, the only evidence of this so-called "confidentiality agreement" is found in Conroy's affidavit. *See Shields Enterprises, Inc. v. First Chicago Corp.*, No. 86 C 10213, 1988 WL 142200 at *4 (N.D. Ill. Dec. 28, 1988) (Moran, J.) (finding that conclusory affidavit was insufficient to demonstrate the confidentiality of documents). No affidavit was submitted by Hobley to confirm that he entered into such an agreement. Furthermore, even if a confidentiality agreement was in place, the scope of that agreement and its application in the present situation, where Hobley is represented by counsel, is unclear. Finally, Hobley is the plaintiff in the underlying action and has spoken to the media on a number of occasions regarding his allegations of torture and abuse. Based on the evidence, the court finds that the Movants have not demonstrated that Hobley's communications with Conroy can be protected under the rubric of "confidential source."

However, that finding does not end the inquiry. When the information sought is from a non-confidential source, the Seventh Circuit directs courts to evaluate subpoenas directed to the media like any other subpoenas, in terms of whether they are "reasonable in the circumstances." *McKevitt*, 339 F.3d at 533. In determining whether a request is "reasonable in the circumstances," courts should look to the established discovery procedures set forth in the Federal Rules of Civil Procedure. *See, e.g., Herbert v. Lando*, 441 U.S. 153, 177 (1979) (although declining to find a constitutional privilege in a libel case involving a newspaper defendant, the Supreme Court stressed the availability

in the Rules of "ample powers of the district judge to prevent abuse," specifically citing Fed. R. Civ. P. 26(b)(1) and 26(c)); *In re Daimlerchrysler AG Securities Litigation*, 216 F.R.D. 395, 402 (E.D. Mich. 2003) (applying the established discovery procedures set forth in the Federal Rules of Civil Procedure to determine whether a discovery request served on a reporter is reasonable).

Rule 45(c) provides other protections in addition to the protection of privileged materials. Subsection (3)(A) of that Rule provides that a court "shall" quash or modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). Subsection (3)(B) of that Rule sets out circumstances under which a court "may" quash or modify a subpoena or may impose specified conditions to production. Fed. R. Civ. P. 45(c)(3)(B). Evaluating the evidence before the court and the arguments of counsel, the court finds, pursuant to Rule 45(c), that the motion must be denied as to Hobley's letters to Conroy but granted as to Conroy's notes relating to Hobley

Hobley's letters have much in common with the tape recordings that were the subject of the *McKevitt* decision. The practical burden of production on Conroy is limited. The letters are three specific, identifiable documents, and will not require an extensive search through Conroy's files. Their potential relevance to the claims and defenses in Hobley's lawsuit is apparent. Because they consist of Hobley's own statements, they may be fodder for cross-examination or lead to other admissible evidence, or possibly deemed an admission under Fed. R. Evid. 801(d)(2). They were sent unsolicited to Conroy, and not anonymously or under a promise of anonymity. At the time, Hobley was convicted and in prison, not acting as a confidential whistleblower. It can be inferred that Hobley's purpose in sending them to Conroy was to obtain publicity for his cause. Considering the larger perspective, the court does not believe that, under these circumstances, the interests protected by the First Amendment will be jeopardized by requiring production of letters from a

11

plaintiff touching on the subjects that form the basis of the lawsuit that he filed.

Conroy's notes, however, are different. It must be remembered that Conroy and Chicago Reader are not parties to this lawsuit. Likewise, this is not a libel action and none of Conroy's articles is a subject of this lawsuit. The only value of the notes to the Individual Defendants is the possibility that they *might* reflect something that Hobley said to Conroy that *might* be helpful to the Defendants. However, the notes are not Hobley's original work. Conroy would almost certainly have to be deposed to interpret them before any use could be made of them, multiplying the burden on Conroy. For example, Conroy took one of the notes during a telephone conversation *about* Hobley; Conroy does not even recall whether he was speaking to Hobley or to someone else. (Conroy Suppl. Aff. ¶ 8.) Production of Conroy's notes would impose a significantly greater burden for significantly less useful material.

Additionally, the Movants argue that if discovery of reporters' notes is permitted in civil litigation, journalistic practices would be forced to change, with the accuracy and quality of journalism suffering. (Suppl. Br. at 9.) Although *McKevitt* undermines the reporter's privilege that had previously been cited in a number of opinions protecting reporters' notes,[5] the decision in *McKevitt* did not discuss the subject of reporters' notes, because the plaintiff only sought the tape recordings. Nothing in *McKevitt* suggests that a reporter's notes are discoverable in civil litigation simply because the reporter interviewed a party to that litigation. In considering the burden versus benefit analysis required under the civil discovery rules, the court in *Daimlerchrysler* aptly observed, "Given the important role that newsgathering plays in a free society, courts must be vigilant against

---

[5] *See, e.g., U.S. v. Lopez*, No. 86 CR 513, 1987 WL 26051 (N.D. Ill. Nov. 30, 1987) (Hart, J.), *Gulliver's Periodicals*, 455 F. Supp. 1197; and *Neal*, 173 F.R.D. 231.

12

attempts by civil litigants to turn non-party journalists or newspapers into their private discovery agents." 216 F.R.D. at 406. While acknowledging that the Sixth Circuit (unlike the Second Circuit) had not adopted the reporters' privilege, the court also found applicable to the burden analysis the concern expressed by the Second Circuit in *Gonzales v. National Broadcasting Co.*:

> If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against any entity that had been the subject of press attention to sift through the press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties . . . .

*Daimlerchrysler*, 216 F.R.D. at 406 ( quoting *Gonzales v. National Broadcasting Co., Inc.*, 194 F.3d 29, 35 (2d Cir. 1999)).

Conroy also argues that his notes are his confidential work product. He argues and states in his affidavit that he has spent 15 years and thousands of hours gathering information on claims of police brutality and that disclosing his notes would severely harm, if not irreparably injure, his ability to continue investigating allegations of police brutality, which is a still-developing story, as well as impair his ability to develop other confidential sources in the future. (Mot. ¶ 15; Reply at 6; Conroy Aff. ¶¶ 24-28.) Rule 45(c)(3)(B)(i) permits the court to protect against "disclosure of a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(c)(3)(B)(i). There is nothing in the Federal Rules that suggests that research for the purpose of news reporting is to be given *less* protection than research for the purpose of product development. The Individual Defendants have not shown a substantial need for Conroy's notes. It is the classic fishing expedition for something that might be helpful. Providing Hobley's letters meets their needs without the unwarranted intrusion into Conroy's work.

Thus, the court finds that requiring Conroy or Chicago Reader to produce notes relating to conversations with or about Hobley would impose an undue burden on the Movants. It would disclose Conroy's confidential research for which the Individual Defendants have not shown a substantial need that cannot be otherwise met. Accordingly, pursuant to Fed. R. Civ. P. 45(c)(3)(A)(iv) and (B)(i), the Movants' motion is granted in part and denied in part as follows: The subpoena is modified to require production only of the three letters Conroy received from Hobley.

## CONCLUSION

For the foregoing reasons, the Motion of John Conroy and Chicago Reader, Inc. to Quash Subpoena and for Entry of Protective Order is granted in part, denied in part and stricken as moot in part. The subpoena directed to the Movants is modified to require production only of Hobley's three letters to Conroy.

IT IS SO ORDERED.

GERALDINE SOAT BROWN
United States Magistrate Judge

September 16, 2004

14