Hobley v. Burge, et al
Case No.        03-3678

**Exhibit
1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MADISON HOBLEY,        )
       )
     Plaintiff,      )
       )
     v.        )   03 C 3678
       )
CHICAGO POLICE COMMANDER JON BURGE,  )  Judge Aspen
DET. ROBERT DWYER, DET. JAMES LOTITO,  )
DET. VIRGIL MIKUS, DET. DANIEL McWEENEY, )
DET. JOHN PALADINO, SGT. PATRICK    )
GARRITY, and the CITY OF CHICAGO,   )
       )
     Defendants.     )   JURY TRIAL DEMANDED

*F I L E[D]*

*JUN 2 2 2004*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COU[RT]*

**DOCKET[ED]**

*JUN 2 5 20[ ]*

### AMENDED COMPLAINT

     NOW COMES Plaintiff, MADISON HOBLEY, by his attorneys, LOEVY & LOEVY and ANDREA D. LYON, and complaining of Defendants, JON BURGE, ROBERT DWYER, JAMES LOTITO, DANIEL McWEENEY, JOHN PALADINO, VIRGIL MIKUS, PATRICK GARRITY, and the CITY OF CHICAGO, states as follows:

### Introduction

     1.   This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

     2.   Specifically, as a result of egregious police misconduct and abuse more fully described below, Plaintiff Madison Hobley was wrongfully convicted for a heinous set of crimes which he did not commit. In all, Mr. Hobley spent more than sixteen years in prison, thirteen of which were on Death Row, after the Defendants conspired to secure his conviction unlawfully by means of violation of his constitutional rights.

3.     After asserting his innocence for more than a decade, the Illinois Supreme Court eventually granted Mr. Hobley leave to conduct extensive discovery into the circumstances of his conviction and the now-notorious pattern of systematic and institutional Area 2 police abuses that produced it. Through the efforts of his counsel, Andrea D. Lyon of the Center for Justice in Capital Cases of the DePaul College of Law, as well as Kurt Feuer, working *pro bono* for the firm of Ross & Hardies, Mr. Hobley was able to prove facts establishing both his innocence and the reprehensible pattern of police abuse that gave rise to his wrongful conviction.

4.     After reviewing the extensive evidence of Mr. Hobley's innocence and the deceitful and unlawful actions of the Defendant Officers, on January 10, 2003, then-Governor George Ryan granted Mr. Hobley a full pardon on grounds of innocence. Mr. Hobley was subsequently released from Death Row after spending sixteen years and four days wrongfully incarcerated.

### Jurisdiction and Venue

5.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

6.     Venue is proper under 28 U.S.C. § 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred within district.

### The Parties

7.     Plaintiff, Madison Hobley, was at all relevant times a citizen of the United States and a resident of Cook County, Illinois.

2

8.    Defendant City of Chicago is an Illinois municipal corporation, and is and/or was the employer of each of the Defendants.  The City of Chicago is responsible for the acts of the Defendants while employed by the City of Chicago and while acting within the scope of their employment.

9.    All of the individual Defendants are present or former Chicago Police Officers.  At the time of Mr. Hobley's arrest and interrogation, Defendant Jon Burge was a duly appointed commander of the City of Chicago Police Department's (hereafter, the "Department") Area 2 Violent Crimes Division and/or Bomb and Arson Division; Defendant Virgil Mikus is or was a detective of the Department's Bomb and Arson Division; Defendant Patrick Garrity is or was a Sergeant in the Department's Crime Laboratory; and Defendants Robert Dwyer, James Lotito, Virgil Mikus, Daniel McWeeney, John Paladino are or were detectives in the Department's Area 2 Violent Crimes Division of which Jon Burge was the Commander.

10.    All of the foregoing individuals are sued in their individual capacities, and all acted under color of law and in the scope of their employment in engaging in their interactions with Mr. Hobley.

### Background

11.    In January 1987, Plaintiff Madison Hobley lived with his wife, Anitta, and infant son, Phillip, in an apartment building on Chicago's South Side, where he worked for a medical supply company.  Prior to the wrongful conviction described in this complaint, Mr. Hobley had no previous criminal convictions.

3

12. Early in the morning hours of January 6, 1987, Mr. Hobley awoke to the sound of a fire alarm. Dressed only in shorts and a T-shirt, Mr. Hobley went from his family's apartment at the top of the inner stairwell on the third floor, into the hallway to investigate the source of the alarm.

13. Believing that he saw smoke coming from under the door of an apartment across from his, Mr. Hobley walked past the stairway door towards the unit down the hall. Mr. Hobley then heard a loud sound as the fire door failed, releasing a raging fire. The glass partition exploded, and a wall of fire and smoke erupted from the stairwell, preventing Mr. Hobley from returning to his wife and baby son.

14. Blocked by the fire, Mr. Hobley attempted to shout to his family, urging them to head for a window to escape. He then crawled down the hall and out of the building via the back stairs. Mr. Hobley never again saw either his wife or his son.

15. Despite the confusion of the inferno around him, and the fear he felt for the safety of his family, Mr. Hobley's immediate reaction was to help others in their time of need. He helped save the life of a neighbor's baby when he helped catch the child as it was dropped out of a second-floor window.

### Attempts to Coerce a Confession

16. Upon discovering that Mr. Hobley survived the fire and his family did not, the Defendant Officers immediately concluded that Mr. Hobley was responsible, deliberately ignoring information about a disgruntled former tenant who had been recently evicted from the building for selling drugs, and failing

4

to pursue any other evidence or investigate any leads to find the real perpetrator of the crime. Instead, the Defendant Officers closed their case before it even began, taking Mr. Hobley from his mother's home less than five hours after he escaped from the deadly fire that killed his wife, Anitta, and young son, Phillip.

17. The now-infamous Area 2 Violent Crimes detective bureau, of which most of the Defendant Officers were members, spent the day interrogating and torturing Mr. Hobley, who was at the time highly distraught over the tragic loss of his family.

18. In an attempt to coerce Mr. Hobley into confessing to starting the fire, a crime for which Mr. Hobley was completely innocent, Defendants Lotito and Dwyer proceeded to torture Mr. Hobley. Specifically, they beat Mr. Hobley, placed a plastic bag over his head until he suffocated and lost consciousness (a practice known in Area 2 and elsewhere as "bagging"), used racially offensive language, and made other threats as they repeatedly attempted to get Mr. Hobley to falsely confess to the arson and murders which he did not commit.

19. Despite the torture and abuse, at no time did Madison Hobley confess. Mr. Hobley refused to confess to any crimes because he did not commit any crimes.

20. Unable to coerce Mr. Hobley into confessing, the Defendant Officers created a false oral confession that they claimed he gave on the day of the fire.

21. The claim by the Defendant Officers that Mr. Hobley had confessed was a lie. In fact, the only written

5

documents created contemporaneously with the interrogation reflect nothing but Mr. Hobley's repeated denials.

22. Defendant Dwyer subsequently claimed that he had to throw away Mr. Hobley's "confession" because it was supposedly rendered illegible after coffee purportedly spilled on it.

### Additional Conspiratorial Acts

23. In furtherance of the conspiracy to frame Mr. Hobley and to support the phony "confession" which the Defendant Officers had supposedly secured, one or more of them conspired to plant physical evidence at the scene of the crime, to wit, they pretended to "find" a gas can at the scene of the fire.

24. In reality, this gas can had been confiscated in another, unrelated case some three weeks prior to the fire for which Mr. Hobley was wrongfully convicted. One or more of the Defendant Officers had removed the can from the Evidence and Recovered Property Section of the Chicago Police Department ("ERPS") and placed it at the scene of the crime where it was "discovered" some fourteen hours after the fire. Indeed, the gas can used to convict Mr. Hobley was clean, showing no signs that it had "survived" the blaze that destroyed Mr. Hobley's home: soot, plaster, heat damage, *i.e.*, traditional evidence of fire and fire suppression, were absent from the can.

25. The Defendant Officers proceeded to conceal information indicating that the gasoline can introduced into evidence during Mr. Hobley's trial was not in fact used to start the fatal fire, but, rather, had been seized earlier at another

6

unrelated fire and planted on the scene in an attempt by
Defendant Officers to implicate Mr. Hobley unjustly.

26. The Defendant Officers also deliberately withheld
an exculpatory fingerprint report from testing conducted by the
Chicago Police Department crime lab on the gasoline can.

27. In furtherance of the conspiracy to frame Mr.
Hobley for crimes he did not commit, the Defendant Officers later
produced two individuals who claimed to have seen Mr. Hobley
purchase gasoline the night of the fire. One of the individuals
could not be certain of his identification, and, only after
persistent undue and improper coercion from the Defendant
Officers, stated that perhaps Mr. Hobley (whom the Defendants
showed him in a line-up) may have "favored" the man he saw
purchase gasoline.

28. Long after he was convicted, Mr. Hobley also
discovered that the second witness was being "helped" by the
Defendant Officers with the witness' own criminal problems,
including an arson that had occurred approximately six weeks
later, committed in the same manner and within only a few blocks
of Mr. Hobley's apartment building. The Defendant Officers,
including Commander Jon Burge, thus provided assistance to the
primary witness against Mr. Hobley in exchange for falsely
implicating Mr. Hobley, and then proceeded to withhold this
exculpatory information notwithstanding their knowledge that they
had a duty to make it known to Mr. Hobley.

29. The Defendant Officers, including Defendant
Garrity, also proceeded to falsely report that Mr. Hobley had

7

failed a polygraph examination, when in fact there is no evidence
that Mr. Hobley had failed such an examination.

### Supervisory Liability

30. The constitutional injuries complained-of herein
were proximately caused by a pattern and practice of misconduct
which occurred with Defendants Burge's knowledge and consent in
his supervisory capacity, such that Burge personally knew about,
facilitated, approved, and condoned this pattern and practice of
misconduct, or else affirmatively turned a blind eye thereto
without taking any steps to stop it.

31. In this way, Defendant Burge is personally
responsible for the complained-of injuries because he knowingly,
willfully, or at least recklessly caused the alleged deprivation
by his action or by his deliberately indifferent failure to act.

32. Independently, Defendant Burge is a supervisor who
failed to stop misfeasor officers under his direction who had
summarily tortured Plaintiff despite his knowledge of the same.

### Plaintiff's Wrongful Conviction

33. As a direct and proximate cause of the Defendant
Officers' unlawful and deceitful actions, including making false
claims of an alleged oral confession, planting of false evidence,
tainting of witnesses (and withholding information about those
circumstances), and withholding of exculpatory evidence,
Plaintiff Madison Hobley was wrongfully convicted of arson and
seven counts of murder, crimes he did not commit.

8

34.   Thereafter, Mr. Hobley was sentenced to death.
He then spent more than sixteen years in prison, over thirteen of
which were on Death Row, before Governor Ryan granted him the
above-described pardon based on his innocence in January 2003.
In Governor Ryans' words: "The category of horrors was hard to
believe.  If I hadn't reviewed the case[] myself, I wouldn't
believe it.... [This is a] perfect example[] of what is so
terribly broken about our system."

### The City's Policy and Practice

35.   This travesty of justice ran its course because
the City of Chicago turned a blind eye to the wave of police
corruption in Area 2 which gave rise to this and other wrongful
convictions.  In fact, Mr. Hobley was the victim of, and all of
his injuries were proximately caused by, a policy and practice on
the part of the City of Chicago which tolerated and even condoned
the systematic deprivation of due process by members of Burge's
now-infamous Area 2 team.

36.   Specifically, throughout the 1980s, a group of
Chicago Police Officers in Area 2 under the command of Defendant
Burge engaged in systematic deprivation of due process in order
to "solve" crimes more expediently and to enhance their personal
standing in the Department.  This reality was known to the
command personnel, who themselves participated in the fabrication
of confessions and other evidence.

37.   The widespread policy and practice of deprivation
of due process involved: concealing exculpatory information;
"planting" evidence; witness manipulation; and, most importantly,

9

fabrication of incriminating evidence, including, but not limited to, the extraction of false confessions via coercion and torture.

38. The methodology in Area 2 for depriving criminal suspects of due process of law by the means described in the preceding paragraph was disturbingly uniform:

a. First, for any given crime, the Area 2 detectives would review the available evidence and select a particular suspect whom they felt might be guilty of that crime.

b. Next, the Area 2 detectives would isolate that unfortunate suspect in an interrogation room in Area 2 headquarters and torture him during interrogation in an attempt to fabricate evidence, to wit, a coerced confession. This torture included electric shocks administered to the testicles and other parts of the body from a small black box, electric shocks with what is now believed to be a cattle prod, suffocation to the point of unconsciousness with plastic bags and a typewriter cover, Russian roulette, burnings, severe beatings, and threats of death.

c. If the Area 2 detectives were successful in extracting a confession via torture during interrogation, the case was closed on the basis of this fabricated evidence, and the suspect was prosecuted. If the Area 2 detectives were unable to extract a confession via torture during interrogation, the detectives would nonetheless fabricate the existence of a false confession, the case was closed on the basis of this fabricated evidence, and the suspect was prosecuted.

d.   In all such cases, the detectives would seek to bolster the false confession (or the false non-confession) with other fabricated evidence which purportedly corroborated that confession. This included, for example, "planting" physical evidence or deliberate manipulation of material witnesses. These detectives furthered the objective of undermining due process by withholding exculpatory information, including the details associated with the practices described above.

39.   All told, there are up to one hundred known victims of this practice of depriving due process of law, though there may well be others. At least thirteen of these individuals ended up on Death Row with Mr. Hobley.

40.   The following individuals were denied due process under Commander Burge's watch in Area 2, all of whom have testified under oath to the deprivations:

> a.   Andrew Wilson
> b.   Alonzo Smith
> c.   Jerry Mahaffey
> d.   Reginald Mahaffey
> e.   David Bates
> f.   Gregory Banks
> g.   Darrell Cannon
> h.   Leonard Hinton
> i.   Steven Bell
> j.   Michael Tillman
> k.   Stanley Howard
> l.   Lavert Jones
> m.   Derrick King
> n.   Philip Adkins
> o.   Walter Johnson
> p.   Roy Wade Brown
> q.   Donald White
> r.   Melvin Jones
> s.   Sylvester Green
> t.   Shadeed Mu'min
> u.   Aaron Patterson
> v.   Andrew Maxwell
> w.   Michael Coleman

11

      x.   Michael Johnson
      y.   Eric Caine
      z.   Gregory Howard

41. In addition to the above-listed victims, the following individuals were also deprived of due process in the above-described manner by Area 2 police officers:

      a.   Dwight Anthony
      b.   Madison Brown
      c.   Ronnie Bullock
      d.   Hobley Collins
      e.   Andre Coulter
      f.   James Daniel
      g.   Raymond Golden
      h.   Anthony Hall
      i.   Mozy Harris
      j.   Roger Harris
      k.   Terry Harris
      l.   Anthony Holmes
      m.   Lee Holmes
      n.   Ronald Jackson
      o.   Nora Jordan
      p.   Leonard Kidd
      q.   James Lewis
      r.   Thomas Liss
      s.   Derrick Martin
      t.   Paul Mike
      u.   Larry Milan
      v.   Doris Miller
      w.   Solomon Morgan
      x.   Ronald Nash
      y.   Lawrence Orange
      z.   William Phillips
      aa.  Alfonso Pinex
      ab.  Willie Porch
      ac.  Lawrence Poree
      ad.  George Powell
      ae.  Alvin Smith
      af.  Willie Stokes
      ag.  Perlie Sutckey
      ah.  Timothy Thompson
      ai.  Tony Thompson
      aj.  Donnell Traylor
      ak.  Leontine Wilbon
      al.  Jackie Wilson
      am.  Jesse Winston
      an.  Cortez Brown
      ao.  James Cody
      ap.  James Andrews

42. Each of Defendants Burge, Dwyer, Lotito, Mikus, McWeeney, Paladino, and Garrity in this case were involved in many of these other cases. According to Chicago's own statistics, for example, Burge was named as an accused in 51% of the cases where the accused officers could be identified.

43. With only one exception, all of the foregoing victims (98%) were African American.

44. All of the accused police officers were white.

45. The Illinois Supreme and Appellate Courts and the United States District Court have reversed convictions and/or ordered new hearings and trials on the basis of evidence of due process violations in, for instance, the following cases: People v. Wilson, 116 Ill. 2d 29 (1987); People v. Banks, 192 Ill. App. 3d 986 (1989); People v. Cannon, 293 Ill. App. 3d 694 (1997); People v. Patterson, 192 Ill. 2d 93 (2000); People v. Bates, 267 Ill. App. 3d 503 (1994); People v. King, 192 Ill. 2d 189 (2000); United States ex. rel. Maxwell v. Gilmore, 1999 WL 130331 (N.D.Ill. 1999).

46. At least a dozen of these instances resulted in civil lawsuits. In 1989, for example, in the case of Andrew Wilson v. City of Chicago, a federal jury concluded that "the City of Chicago had a *de facto* policy, practice or custom whereby Chicago police officers were allowed to physically abuse persons suspected of injuring or killing another Chicago police officer." On appeal of the Wilson case, Chicago itself characterized Burge's actions as "sadistic torture."

47.   As a Northern District of Illinois Judge observed
in a written opinion ten years after <u>Wilson</u>: "It is now [by 1999]
common knowledge that in the early to mid-1980s Chicago Police
Commander Jon Burge and many officers working under him regularly
engaged in the physical abuse and torture of prisoners to extract
confessions.   Both internal police accounts and numerous lawsuits
and appeals brought by suspects alleging such abuse substantiate
that those beatings and other means of torture occurred as an
established practice, not just on an isolated basis."

48.   Former Police Superintendent Richard Brzeczek, who
was Superintendent when many of the torture allegations arose,
recently told the *Chicago Tribune* that there is now "no doubt in
[his] mind that Burge and his men tortured some suspects."

### Chicago's "Blind Eye"

49.   The due process violations described in the
preceding paragraphs were allowed to take place because the City
declined to implement any mechanism for oversight or punishment.

50.   In particular, the Department's system for
disciplining police officers for violating due process in this
manner is basically nonexistent.   During the time period at
issue, the agency charged with investigating these allegations
(O.P.S.) failed to investigate many of them.   For those which the
O.P.S was forced to investigate, it rejected approximately 95% of
all complaints of abuse, and the very few which were "sustained"
were usually overturned on review such that no discipline was
ever imposed.   The pattern described in this Paragraph continues
unchanged to this day.

14

51. In 1987, then-Chief Administrator of O.P.S. David Fogel wrote a memo admitting that O.P.S. was a farce.

52. Specifically, the Fogel Memo admits that "the troops love O.P.S. . . . [It] actually operates to immunize police from internal discipline. . . and has institutionalized lying." Fogel's Memo explained that a substantial proportion of O.P.S.' investigators were thoroughly incompetent, part of a "politically corrupt heritage of pre-[Mayor Harold] Washington days."

53. Fogel's Memo concludes in part that: "O.P.S. gives the appearance of formal justice, but actually helps to institutionalize subterfuge and injustice."

54. With respect to the allegations of due process violations in Area 2, the O.P.S. initially found that each and every one of the allegations was groundless. Thus, at the time the allegations were first made, no Chicago police officer was deemed culpable, much less disciplined, for any of these allegations.

55. In addition to failing to discipline the offending officers internally, the Department also referred none of these allegations to the State's Attorney's Office for possible prosecution of the officers. This institutional unwillingness to refer police officers for prosecution was true throughout the relevant time period, and it continues through to the present.

56. In this way, Chicago police officers who violated the due process rights of criminal suspects by, *inter alia*, fabricating evidence regarding confessions, had every reason to know that they enjoyed *de facto* immunity from criminal

15

prosecution and/or Departmental discipline, thereby encouraging the very type of abuse at issue in this case.

## Suppression of Exculpatory Information

57.   In September 1990, an O.P.S. investigator named Goldston concluded a study of more than fifty allegations of constitutional violations in Area 2 through the mid-1980s; this investigation was based on review of cases one by one, and the data was compiled into a lengthy statistical analysis.

58.   The resulting Goldston Report dated September 28, 1990 (which was after Mr. Hobley was convicted but before his appeal was resolved) concluded that a "preponderance" of evidence dictated the conclusion that "systematic" and "methodical" abuse occurred over a ten year period, abuse which was "not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture."

59.   The Report also concluded that certain unnamed "[p]articular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end."

60.   With respect to Mr. Hobley's case, the Goldston Report constituted material exculpatory evidence which could have helped to exonerate him.   Because it documents dozens of similar examples of very similar abuses, Mr. Hobley could have used the evidence contained in the Report as part of his defense in his direct and post-conviction appeals.

61.   This exculpatory evidence is particularly compelling because although the allegations come from disparate

individuals with no connection to one another and no knowledge of each other's complaints, the allegations nonetheless exhibit uncanny similarity in terms of details such as, for instance, the seemingly improbable practice of suffocation by "bagging" experienced by Mr. Hobley.

62. Instead of disclosing the new exculpatory evidence to Mr. Hobley's defense, Former Police Superintendent Leroy Martin and O.P.S. Chief Administrator Gayle Shines suppressed the Goldston Report. In fact, for fifteen months, Martin and Shines kept the Report a secret and showed it to no one.

63. Then-Superintendent Martin was motivated to suppress the Goldston Report at least in part because he himself had headed Area 2 during some of the relevant time period, in which capacity he was Burge's direct supervisor.

64. During the fifteen months that Martin and Shines were suppressing the Goldston report, they also took no action at all regarding any of the allegations. Despite the evidence and conclusion that abuses during interrogations had been "methodical" and "systematic," no move was made to discipline any police officer, and the Report's contents were instead completely swept under the rug.

65. In 1992, district court Judge Milton 1. Shadur unsealed (over Chicago's objections) the secret Goldston Report by court order, precipitating public disgrace for the Department.

### Still More Suppression of Exculpatory Materials

66. Less than half of the fifty examples of abuses cited in the Goldston Report had even been investigated

17

contemporaneously by O.P.S. Overall, only one of the fifty cases had resulted in a finding adverse to an accused police officer. Thus, with only one exception, the Department either conducted no investigation or cleared the accused in every one of these fifty due process violations.

67. In 1992, with public attention focused on suppressed accusations of police abuses after the Goldston Report came to light (as well as the initiation of proceedings to terminate Burge that same year), then-Superintendent Brzeczek publicly promised an investigation into allegations of police torture in Area 2.

68. To that end, nine of the allegations of were re-opened by O.P.S.

69. In most of these re-opened cases, the subsequent re-investigation reversed the original exonerations and instead "sustained" findings of wrongdoing on the part of the accused officers.

70. In spite of these new conclusions that certain police officers were guilty of fabricating false evidence via coercion during interrogations, the Department took no disciplinary action against any officer (many of whom were still on the force) except Burge.

71. Instead, approximately five years after the re-investigations found these allegations credible and recommended discipline, then-Police Superintendent Terry Hillard and his general counsel, Thomas Needham, made a secret decision to "shelve" all of these new O.P.S. findings.

18

72.   Specifically, in August 1998, Needham wrote a confidential Memo instructing O.P.S. to close all of the cases and to re-classify all of these newly "sustained" findings as "non-sustained," thereby clearing all of the officers.

73.   Although Needham subsequently claimed he had never really read the files and Hillard claimed he never even saw them, the authority to summarily reverse the sustained findings and close these cases without further investigation was vested exclusively in Mr. Hillard.  Under Chicago's policy, said action could only have been undertaken at Hillard's direction.

### Further Cover-Up/Withholding

74.   From 1992 through 1999 the Department and the Defendants with authority over these matters kept a secret of the new "sustained" findings and the related evidence supporting the victims such as Mr. Hobley.  This secret might have remained buried forever had it not been exposed involuntarily per court order in the course of a civil case against Chicago in mid-1999.

75.   In this way, for more than six years, Martin, Shines, Hillard, and Needham, acting in concert with the Defendants and others, all suppressed exculpatory evidence from Mr. Hobley and other victims who had been convicted based on fabricated confessions.  Instead of using this evidence to remedy the miscarriages of justice, these individuals first buried the evidence, then summarily nullified it, and then tried to conceal that decision as well.

76.   As a result of these actions, Mr. Hobley and the other victims faced execution without the benefit of the

19

knowledge/evidence that Chicago's investigators had subsequently corroborated their contentions that there were systematic due process violations and widespread fabrication of evidence taking place in Area 2. The reason the victims never learned this was because the Defendants improperly hid it from them.

77. In Mr. Hobley's case, this new evidence was all withheld from Mr. Hobley's criminal defense team for almost a decade as he continued to reside on Death Row litigating his post-conviction position in the courts. Had the information been provided to Mr. Hobley rather than suppressed, his post-conviction proceedings would have been resolved favorably to Mr. Hobley, and at a much earlier date than his pardon.

### Aftermath

78. Other than Burge, who was fired, and two other officers who merely served suspensions, Chicago has never disciplined any police officer for any of the allegations of fabricated confessions, including those officers who were subsequently adjudicated culpable after the re-investigations. Nor were any of the involved officers ever referred to the State's Attorneys' Office for prosecution, and some remain on the force to this day unpunished in any manner.

79. Even after Needham's secret Memo (reversing all of the sustained findings and closing the cases summarily) surfaced in 1999, the City, through Hillard and his spokeswoman, made clear that the Department was now finished with these allegations, and that no officer would ever be punished in the future. In a deposition in 1999, Hillard stated under oath in

20

his capacity as Chicago Police Superintendent that he "didn't know nothing" about the Goldston Report.

80.   Burge is now retired in Florida; despite his termination for torturing people, is presently supported by approximately $30,000/year in pension by the City of Chicago.

### Mr. Hobley's Damages

81.   Before he received his pardon on the basis of innocence last year, Mr. Hobley suffered enormously.  After losing his family under the most tragic of circumstances, Mr. Hobley then had to bear the loss of his freedom and the almost-unimaginable indignities of prison and Death Row, all under the specter of an unjust death sentence.

82.   If not for Governor Ryan's efforts to correct this injustice, Mr. Hobley might well have been electrocuted or poisoned by the State of Illinois by lethal injection for a crime he had nothing to do with, all as a result of Defendants' malfeasance in the manner described herein.

### Count I -- 42 U.S.C. § 1983

### Due Process

83.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

84.   As described more fully above, each of the Defendants, while acting under color of law and within the scope of their employment as police officers, deprived Plaintiff of his constitutional right to a fair trial.

85.   Each of the Defendant Officers deliberately withheld exculpatory evidence, as well as provided false

21

evidence, thereby misleading and misdirecting the state criminal prosecution of the Plaintiff. To wit, the Defendant Officers provided false allegations that were the basis of the criminal complaint, withheld exculpatory evidence throughout the proceedings, and fabricated evidence that was the bases of the criminal prosecution. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

86. Specifically, the Defendants concealed the fact that Plaintiff had never confessed as alleged by the prosecution at trial, assisted in tainting the testimony of the witnesses who testified against Plaintiff, assisted in planting the gas can, the physical evidence at the scene of the fire which was then used to convict Plaintiff, assisted in withholding evidence of witness manipulation, and/or assisted in withholding the exculpatory fingerprint report relating to said gas can. All of these Defendants then proceeded to conceal these facts from Plaintiff and the criminal court.

87. The Defendants used violence and torture against Plaintiff (or, alternatively, knew that violence and torture had been used against Plaintiff) to try to coerce him to confess falsely because those Defendants knew that Plaintiff was in fact innocent of the crime for which they were trying to frame him.

88. Additionally, these Defendants also conspired to conceal the fact that each of them had actual knowledge that torture had been used against Plaintiff during the interrogation session which supposedly produced what was subsequently claimed at his criminal trial to be a confession. The identities of

22

these particular officers who had actual knowledge that Plaintiff had been tortured therefore constituted exculpatory information withheld from the defense. Moreover, Plaintiff did not know the identity of any of the Defendants who had knowledge of this torture other than those Defendants who were physically present in the room at the time.

89. The misconduct of the Defendant Officers also resulted in the criminal conviction of Plaintiff, thereby denying him his Constitutional right to a fair trial as it is secured to Plaintiff in the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

90. As a result of the violation of his constitutional right to fair trial, Plaintiff suffered injuries, including but not limited to emotional distress.

91. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

92. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## COUNT II -- Section 1983

### False Arrest

93. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

94. Plaintiff was improperly seized and arrested without legitimate probable cause, to wit, Plaintiff was denied liberty without justification in violation of the Constitution.

95. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff has suffered damages, including but not limited to substantial mental distress and anguish.

96. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

## Count III -- 42 U.S.C. § 1983

### Equal Protection

97. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

98. As described more fully above, the Defendant Officers, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff equal protection of the law in violation of his Constitutional rights.

99. Specifically, these Defendants actively participated in or personally caused misconduct in terms of "framing" minority criminal suspects in a manner designed to secure improper convictions. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

100. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress.

101. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

102. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### COUNT IV -- Section 1983

### Conspiracy to Deprive Plaintiff's Constitutional Rights

103. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

104. Prior to the arrest of Plaintiff, the police personnel in Area 2 reached an agreement among themselves to violate the due process rights of criminal suspects in order to "close" as many cases as possible as fast as possible. This conspiracy involved an agreement to conceal exculpatory information, "plant" evidence, manipulate witnesses, and, most importantly, fabricate incriminating evidence, including but not limited to the extraction of false confessions via torture.

105. In furtherance of this illicit conspiracy to deprive criminal suspects of due process of law, personnel in Area 2 agreed to implement, and did in fact implement, the following agreed methodology on a widespread scale:

a.   First, it was agreed that for any given crime, the Area 2 detectives would select a particular suspect whom they felt might be guilty of that crime based on the evidence then available.

b.   Next, it was agreed that the Area 2 detectives would isolate that unfortunate suspect in an interrogation room in Area 2 headquarters and torture him during interrogation in an attempt to extract a confession.

c.   It was further agreed in advance that if the Area 2 detectives were able to extract a confession via torture during interrogation, the case would be closed on the basis of this fabricated evidence, and the suspect would be prosecuted. On the other hand, if the detectives were unable to extract a confession via torture during interrogation, it was agreed in advance that the detectives would simply fabricate that piece of evidence (i.e., the existence of a confession), and the case was closed and the suspect prosecuted on the basis of this fabricated evidence.

d.   In all such cases, it was agreed that the detectives would seek to bolster the false confession (or the false non-confession) with other fabricated evidence which purportedly corroborated that confession. This included, for example, "planting" physical evidence or deliberate manipulation of material witnesses. These detectives further agreed to advance the objective of undermining due process by withholding exculpatory information, including the details associated with the practices described above.

106. Based on the evidence now available, the agreed methodology described above played out at least one hundred times in Area 2. In addition to the individuals described above, one such victim of this reoccurring and ongoing conspiracy to violate due process was Mr. Hobley.

107. In particular, after the fire at issue in Plaintiff's case, Defendants Burge, Lotito, Dwyer, Paladino, Garrity, and Mikus all implemented the illicit agreed-plan described above. In this way, the Defendant Officers conspired, and continue to conspire, to deprive Plaintiff of his constitutional rights to be free of violations of due process, false arrest and malicious prosecution as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

108. Specifically, Defendants Burge, Lotito, Dwyer, Paladino, Garrity, Mikus and Paladino, as well as some of the other Officers in Area 2, reached an agreement to attempt to extract a false confession via torture, then, having failed, to conceal the fact that Plaintiff had never confessed to the murders as alleged by the prosecution at the criminal trial, as well as the additional fact that Plaintiff had not failed a polygraph as reported by Defendant Garrity.

109. Defendants Burge, Lotito, Dwyer, Paladino, Garrity, Mikus and Paladino, as well as some of the other Officers in Area 2, also reached an agreement either to assist in tainting the testimony of the witnesses who testified against Plaintiff or else to assist in planting the gas can, the physical evidence at the scene of the fire which was then used to convict

27

Plaintiff; all of these Defendants then proceeded to agree to conceal all of these facts, as well as the exculpatory fingerprint report, from Plaintiff and the criminal court.

110. Additionally, these Defendants also conspired to conceal the fact that each of them had actual knowledge that torture had been used against Plaintiff during the interrogation session which supposedly produced what was subsequently claimed at his criminal trial to be a confession. The identities of these particular officers who had actual knowledge that Plaintiff had been tortured therefore constituted exculpatory information withheld from the defense, and Plaintiff did not then know the identity of any of these Defendants who had knowledge of this torture other than those Defendants who were physically present in the room at the time.

111. Police Superintendents Leroy Martin and Terry Hillard, Chief Administrator of Chicago's Office of Professional Standards Gayle Shines and attorney Thomas Needham, as well as the other Defendants and other unnamed co-conspirators, also contributed to this conspiracy to deprive Plaintiff's constitutional rights. They did so by intentionally concealing exculpatory information which would have enabled Plaintiff to successfully challenge his conviction and obtain a new trial had that information not been suppressed, to wit, these individuals concealed the existence of the Goldston report and other exculpatory materials which would have helped to exonerate Plaintiff had they not been suppressed.

28

112. In the manner described in the preceding paragraphs, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

113. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. One such overt act was the physical torture of Plaintiff; in fact, a conspiracy to commit violence continues to this day because overt acts in support of this conspiracy have continued unabated to the present.

114. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

115. As a proximate result of the conspiracy, Plaintiff suffered financial damage, as well as severe emotional distress.

116. This conspiracy was undertaken for the additional purpose of punishing Plaintiff for exercising his First Amendment right to speak out about matters of public concern, namely, the police abuses described above.

117. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described more fully in preceding paragraphs.

### COUNT V -- Section 1983

### Conspiracy With O.P.S. to Deprive Constitutional Rights

118. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

119. Prior to date of the constitutional injuries suffered by Plaintiff in this case, it was agreed among the police officer Defendants, on the one hand, and the individuals who comprise the Office of Professional Standards on the other hand, that if any members of the Chicago Police Department were subsequently accused by citizens of due process violations, then the O.P.S. employees, including the aforementioned investigators, would either take no action to investigate or, if investigation was unavoidable, actively endeavor to deem those citizen complaints unfounded or unsustained, even where they knew that the police officers in fact violated citizens' rights (hereafter, the "Agreement").

120. In furtherance of this illicit Agreement, it was further agreed among the Defendant police officer on the one hand, and the individuals who comprise the O.P.S. on the other hand, that if a due process complaint were to arise, then the O.P.S. would deliberately avoid interviewing the accused police officers (contrary to the written policy on the books which should have required such an interview) until after the victim was prosecuted and convicted. This Agreement, which facilitated the abuse at issue by insulating rogue police officers from scrutiny, was carried out in numerous cases over the years, including Plaintiff's case, in which the O.P.S. repeatedly and deliberately kept deferring an interview of the Defendant Officers about Plaintiff's allegations month after month for the entire period of years it took to obtain his conviction.

30

121. It was further agreed by the above-named conspirators that when the Goldston report and other similar evidence subsequently arose, it would be (and was) suppressed.

122. At all relevant times, the Agreement referenced in the preceding four paragraphs was the policy and practice of the Chicago Police Department, and was tacitly ratified by policy-makers for the City of Chicago with final policymaking authority.

123. As a direct and proximate result of the illicit prior Agreement described above, Plaintiff's rights were violated.

124. Specifically, Plaintiff was subjected to violation of his due process rights and other constitutional injuries as a direct result of the Agreement with O.P.S. employees to decline to sustain citizen complaints even where meritorious. Because of this Agreement, the Defendants were encouraged to believe they could act with impunity and without fear of any repercussions, even where they purposefully violated the rights of criminal suspects. In this manner, the alleged Agreement proximately caused all of the injuries suffered by Plaintiff in this case.

125. In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

126. Independently, before and after Plaintiff's conviction, each of the Defendants further conspired, and continue to conspire, to deprive Plaintiff of exculpatory

led to his exonerated of the false charges as described in the various Paragraphs of this Complaint.

127. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity. One such overt act was the suppression of the Goldston report. Another overt act is the continued suppression of material documents in the current litigation, a problem which continues to this day.

128. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

129. As a proximate result of the conspiracy, Plaintiff suffered financial damage, as well as severe emotional distress.

130. This conspiracy was undertaken for the additional purpose of punishing Plaintiff for exercising his First Amendment right to speak out about matters of public concern, namely, about the police abuses described above.

131. The misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described more fully in preceding paragraphs.

### COUNT VI -- Section 1985(3) Conspiracy
### Conspiracy to Deprive Constitutional Rights

132. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

133. As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

32

134. In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiff.

135. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

136. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

### Count VII -- R.I.C.O.

137. Plaintiff incorporates all of the paragraphs of this Complaint as if fully set forth herein.

138. Over the course of years, each of the individual Defendants have conducted, and continue to conduct, racketeering activity through their positions as agents of the Chicago Police Department and other law enforcement agencies in a manner that has caused harm to Plaintiff's business and property.

139. Specifically, these Defendants have associated with an enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. Each individual Defendant played some part in directing those affairs.

140. The racketeering activity referred to in the preceding paragraphs satisfies the conduct requirement in that it includes the provision of false documents, fabricated evidence, and the false testimony of others to the State's Attorneys' Office, which then used this information to prosecute Plaintiff

33

and others. In so doing, Defendants directed these criminal investigations in their official positions with the Department.

141. The Chicago Police Department is an enterprise as defined under 18 U.S.C. § 1961, which is engaged in and affects interstate commerce.

142. The racketeering activity referred to in the preceding paragraphs includes, at a minimum, at least two predicate acts with the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

143. The predicate acts referred to in the preceding paragraphs include, among others, the Defendants' actions in framing Plaintiff and others for murder. This includes but is not limited to using their official positions to obstruct state and local criminal investigations, commit perjury, tamper with witnesses (including the inducement of witnesses to give false statements), and otherwise cover up their misconduct in working to obstruct justice and procure false convictions.

144. RICO's continuity element is satisfied here in the manner described more fully above in that Defendants engaged in a series of related attempts to fabricate evidence and otherwise frame criminal suspects and to thwart attempts to overturn their wrongful convictions over a substantial period of time (close-ended continuity) and because the Defendants' misconduct, by its nature, projects into the future with a threat of repetition (open-ended continuity), including but not limited to the still

34

continuing conspiracy to avoid prosecution for their misdeeds and the suppression of evidence and false statements made in discovery responses in this case.

145. The Defendants have engaged in a long-standing pattern of racketeering activity that continues to this day. The acts comprising this racketeering activity are related to each other and pose a threat of continued criminal activity, as demonstrated, *inter alia,* by the repeated nature of the malfeasance described above and the more than 100 victims known to date.

146. As a result of Defendants' conduct, Plaintiff has suffered injuries to his business and/or property. Specifically, Plaintiff suffered a loss of business reputation and damage to his then-existing business opportunities, was forced to pay legal fees, and lost bond money, as well as interest and fees on that bond money, all as a direct and proximate result of Defendants' racketeering activity.

147. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and indifference to the rights of others.

148. The misconduct described herein proximately caused Plaintiff injuries for which he is entitled to treble damages.

149. The misconduct in this Count was undertaken by Defendants within the scope of their employment and under color of law such that their employers are liable for their actions.

### Count VIII - RICO Conspiracy

150. Plaintiff incorporates all of the paragraphs of this Complaint as if fully set forth herein.

35

151. As described more fully above, each of the individual Defendants in this action agreed, impliedly or directly, to participate in framing Plaintiff for crimes he did not commit. These Defendants agreed, impliedly or directly, that some of them would commit a pattern of racketeering activity in order to harm Plaintiff, and then took actions in furtherance of that common objective.

152. As a result of Defendants' conduct, Plaintiff has suffered injuries to his business and/or property. Specifically, Plaintiff has had to pay legal fees, suffered a loss of business reputation, and lost bond money, as well as interest and fees on that bond money, as a direct and proximate result of Defendants' racketeering activity.

153. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of others.

154. The misconduct described in this Count was undertaken by Defendants within the scope of their employment and under color of law such that their employers are liable for their actions.

## Count IX -- 42 U.S.C. § 1983

### Police Torture

155. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

156. As described above, Defendants Dwyer and Lotito beat Madison Hobley and placed a plastic typewriter cover over

36

his head, intentionally causing Plaintiff to suffocate while other Defendants looked on without intervening.

157. Although Plaintiff never actually succumbed to the torture, the Defendants falsely claimed that he did, to wit, they invented a purported "confession" which they then provided to the prosecutors. This alleged confession was introduced at trial against Plaintiff, and was a decisive piece of "evidence" leading to his conviction.

158. As a result of Defendants Dwyer and Lotito's unjustified and excessive use of force, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages.

159. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

160. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

### Count X -- 42 U.S.C. § 1983

### Failure to Intervene to Prevent Constitutional Violations

161. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

162. During the violations of Plaintiff's rights described more fully above, each of the Defendants stood by without intervening to prevent those violations of Plaintiff's rights.

163. As a result of the Defendants' failure to intervene to prevent these violations of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

164. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

165. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described in preceding paragraphs.

### Count IX -- Section 1983

### Monell Claim

166. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

167. All of the constitutional violations described in this Complaint were undertaken pursuant to the policy and practice of the City of Chicago (all in the manner described more fully above in prior sections of this Complaint) in that:

a.    As a matter of both policy and practice, the Chicago Police Department directly encouraged, and was thereby the  moving force behind, the very type of constitutional violation at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

38

b. As a matter of both policy and practice, the Department facilitates the very type of constitutional violation at issue here by failing to adequately punish and discipline prior instances of misconduct, including "repeater" offenders who exhibit patterns of abuse, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff;

c. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Department violated the constitutional rights of citizens in a manner similar to that alleged by Plaintiff on a frequent basis, all with the knowledge and acquiescence of supervisory and command personnel, yet the Department makes findings of wrongdoing in a disproportionately small number of cases;

d. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, the Department refuses to refer police officers for prosecution even when they commit violent crimes such that said officers are encouraged to believe they enjoy *de facto* immunity from criminal prosecution.

e. Plaintiff's injuries were also caused by the policies and practices on the part of the City of Chicago of suppressing exculpatory Brady materials and improperly refusing to create exculpatory Brady materials.

f. Plaintiff's injuries were also caused by the policies and practices of endeavoring to coerce confessions, failing to video tape interrogations, and the systematic

39

fabrication of evidence, including false police reports, all
designed to encourage prosecutions and secure convictions
regardless of actual guilt or innocence.

        g.    Municipal policy-makers and Department
supervisors are aware of (and condone and facilitate by their
inaction) a "code of silence" in the Chicago Police Department,
by which officers fail to report and otherwise lie about
misconduct committed by other officers, such as the misconduct at
issue in this case; and

        h.    The City of Chicago failed to timely act to
remedy the patterns of abuse described in the preceding sub-
paragraphs, despite actual knowledge of the same, thereby
ratifying the unlawful practices and causing the types of
injuries described herein.

        168. Additionally, the unconstitutional withholding of
exculpatory information from Plaintiffs' defense in this case, as
well as the subsequent destruction of some of the same, was all
undertaken pursuant to, and proximately caused by, a policy and
practice on the part of the Chicago Police Department, including
the Defendants in this action, to systematically suppress <u>Brady</u>
material by intentionally secreting discoverable information in
so-called "street files." As a matter of widespread custom and
practice, these clandestine street files were routinely withheld
from the State's Attorney's Office and from criminal defendants
and were subsequently destroyed.

        169. Consistent with the municipal policy and practice
described in the preceding paragraphs, Defendants in this case

concealed exculpatory evidence within street files which were never disclosed to Plaintiffs' criminal defense teams and which have since been destroyed. This withholding and destruction of evidence which would have exonerated Plaintiffs was undertaken pursuant to the City's policy and practice in the manner described above.

170. Another policy and practice which proximately caused Plaintiff's injuries was the flawed administration of evidence in the ERPS, all as described above. In particular, those lax policies and practices enabled and even encouraged Chicago Police Officers to believe they could take evidence out of ERPS and "plant it" at crime scenes with total impunity.

171. All of the policies and practices described in the foregoing paragraphs were consciously approved at the highest policy-making level for decisions involving the Police Department, and were a proximate cause of the injuries suffered here by Plaintiff. On the basis of all of the foregoing, the City of Chicago is liable to Plaintiff for his injuries.

## COUNT XII -- State Law Claim

## Intentional Infliction of Emotional Distress

172. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

173. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

41

174. Said actions and conduct did directly and proximately cause severe emotional distress to Plaintiff and thereby constituted intentional infliction of emotional distress.

175. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

176. As a proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.

## COUNT XIII -- State Law Claim
### Civil Conspiracy

177. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

178. As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

179. As described more fully in the preceding paragraphs, the complained of conspiracy included among its objectives a conspiracy to maliciously prosecute and a conspiracy to inflict emotional distress via police torture, said conspiracies having been carried out on innumerable occasions before the torture experienced by Plaintiff in this case.

180. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity. Among these overt acts were the torture of

42

Plaintiff, as well as the torture of all of the other victims of this practice.

181. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

182. As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish.

### COUNT XIV -- State Law Claim
### Malicious Prosecution

183. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

184. Plaintiff was improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of innocence.

185. The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

186. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that the statements were false and perjured. In so doing, Defendant Officers fabricated evidence and withheld exculpatory information.

43

187. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

188. As a result of this misconduct, Plaintiff has suffered and continues to suffer injuries including pain and suffering.

### COUNT XV - State Law Claim

### Respondeat Superior

189. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

190. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of their employment.

191. Defendant City of Chicago is liable as principal for all torts committed by its agents.

### COUNT XVI - State Law Claim

### Indemnification

192. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

193. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

194. The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

44

WHEREFORE, Plaintiff, MADISON HOBLEY, respectfully requests that this Court enter judgment in his favor and against Defendants, JON BURGE, ROBERT DWYER, JAMES LOTITO, DANIEL McWEENEY, JOHN PALADINO, VIRGIL MIKUS, PATRICK GARRITY, and the CITY OF CHICAGO, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the Defendant Officers in their individual capacities and treble damages under the R.I.C.O. statute, as well as any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, MADISON HOBLEY, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

Arthur Loevy
Jon Loevy
Michael Kanovitz
Kurt Feuer
Jon Rosenblatt
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900


Professor Andrea D. Lyon
The Center for Justice in Capital Cases
    of the DePaul College of Law
25 East Jackson Blvd.
Chicago, IL 60604

Hobley v. Burge, et al
Case No.      03-3678

**Exhibit
2**

Job No. 927-6999
Series No. 874-1612

# APARTMENT LEASE
## UNFURNISHED

All warranties, including merchantability and fitness, are excluded.

| DATE OF LEASE | TERM OF LEASE | | MONTHLY RENT | SECURITY DEPOSIT * |
|---|---|---|---|---|
| | BEGINNING | ENDING | | |
| November 12, 1986 | November 1986 | 31 October 1987 | $320.00 | $420.00 |

*IF NONE, WRITE "NONE". Paragraph 2 of this Lease then INAPPLICABLE.*

**LESSEE**

NAME • Madison K. Hobley

APT. NO. • 301

ADDRESS OF PREMISES • 1121 E. 82nd Street

Chicago, IL 60619

**LESSOR**

NAME • Lucile Marks, owner
Louis J. Casa, agent

BUSINESS ADDRESS • 1133 E. 82nd Street

Chicago, IL 60619

In consideration of the mutual covenants and agreements herein stated, Lessor hereby leases to Lessee and Lessee hereby leases from Lessor for a private dwelling the apartment designated above (the "Premises"), together with the appurtenances thereto, for the above Term.

---

**ADDITIONAL COVENANTS AND AGREEMENTS** *(if any)*

Tenant states that his legal name is "MADISON K. HOBLEY", but his employer, Foster Medical Corp. has him listed as "MATTHEW K. HOBLEY".
Lease includes stove, refrig. heat, free cooking gas, security bars on both doors to apart.
Tenat is responsible for any damage due to accident or negligence on his part or that of his guests. No alterations are allowed in apartment without consent of agent.
At termination of this lease, tenant will clean apartment and particularly the stove to the satisfaction of agent.

---

## LEASE COVENANTS AND AGREEMENTS

**RENT**

1. Lessee shall pay Lessor or Lessor's agent as rent for the Premises the sum stated above, monthly in advance, until termination of this lease, at Lessor's address stated above or such other address as Lessor may designate in writing.

**SECURITY DEPOSIT**

2. Lessee has deposited with Lessor the Security Deposit stated above for the performance of all covenants and agreements of Lessee hereunder. Lessor may apply all or any portion thereof in payment of any amounts due Lessor from Lessee, and upon Lessor's demand Lessee shall in such case during the term of the lease promptly deposit with Lessor such additional amounts as may then be required to bring the Security Deposit up to the full amount stated above. Upon termination of the lease and full performance of all matters and payment of all amounts due by Lessee, so much of the Security Deposit as remains unapplied shall be returned to Lessee. This deposit does not bear interest unless and except as required by law. Where all or a portion of the Security Deposit is applied by Lessor as compensation for property damage, Lessor when and as required by law shall provide to Lessee an itemized statement of such damage and of the estimated or actual cost of repairing same. If the building in which Premises are located (the "Building") is sold or otherwise transferred, Lessor may transfer or assign the Security Deposit to the purchaser or transferee of the Building, who shall thereupon be liable to Lessee for all of Lessor's obligations hereunder, and Lessee shall look thereafter solely to such purchaser or transferee for return of the Security Deposit and for other matters (including any interest or accounting) relating thereto.

**CONDITION OF PREMISES; REDELIVERY TO LESSOR**

3. Lessee has examined and knows the condition of Premises and has received the same in good order and repair except as herein otherwise specified, and no representations as to the condition or repair thereof have been made by Lessor or his agent prior to, or at the execution of this lease, that are not herein expressed or endorsed hereon; and upon the termination of this lease in any way, Lessee will immediately yield up Premises to Lessor in as good condition as when the same were entered upon by Lessee, ordinary wear and tear only excepted, and shall then return all keys to Lessor.

**LIMITATION OF LIABILITY**

4. Except as provided by Illinois statute, Lessor shall not be liable for any damage occasioned by failure to keep Premises in repair, and shall not be liable for any damage done or occasioned by or from plumbing, gas, water, steam or other pipes, or sewerage, or the bursting, leaking or running of any cistern, tank, wash-stand, water-closet, or waste-pipe, in, above, upon or about the Building or Premises, nor for damage occasioned by water, snow or ice being upon or coming through the roof, skylight, trap-door or otherwise, nor for damages to Lessee or others claiming through Lessee for any loss or damage of or to property wherever located in or about the Building or Premises, nor for any damage arising from acts or neglect of co-tenants or other occupants of the Building, or of any owners or occupants of adjacent or contiguous property.

**USE; SUBLET; ASSIGNMENT**

5. Lessee will not allow Premises to be used for any purpose that will increase the rate of insurance thereon, nor for any purpose other than that hereinbefore specified, nor to be occupied in whole or in part by any other persons, and will not sublet the same, nor any part thereof, nor assign this lease, without in each case the written consent of the Lessor first had, and will not permit any transfer, by operation of law, of the interest in Premises acquired through this lease, and will not permit Premises to be used for any unlawful purpose or purpose that will injure the reputation of the same or of the Building or disturb the tenants of the Building or the neighborhood.

**USE AND REPAIR**

6. Lessee will take good care of the apartment demised and the fixtures therein, and will commit and suffer no waste therein; no changes or alterations of the Premises shall be made, no partitions erected, nor walls papered, nor locks on doors installed or changed, without the consent in writing of Lessor; Lessee will make all repairs required to the walls, ceilings, paint, plastering, plumbing work, pipes and fixtures belonging to Premises, whenever damage or injury to the same shall have resulted from misuse or neglect; no furniture filled or to be filled wholly or partially with liquids shall be placed in the Premises without the consent in writing of Lessor; the Premises shall not be used as a "boarding" or "lodging" house, nor for a school, nor to give instructions in music, dancing or singing, and none of the rooms shall be offered for lease by placing notices on any door, window or wall of the Building, nor by advertising the same directly or indirectly, in any newspaper or otherwise, nor shall any signs be exhibited on or at any windows or exterior portions of the Premises or of the Building without the consent in writing of Lessor; there shall be no lounging, sitting upon, or unnecessary tarrying in or upon the front steps, the sidewalk, railing, stairways, halls, landing or other public places of the Building by Lessee, members of the family or others persons connected with the occupancy of Premises; no provisions, milk, ice, marketing, groceries, furniture, packages or merchandise shall be taken into the Premises through the front door of the Building except where there is no rear or service entrance; cooking shall be done only in the kitchen and in no event on porches or other exterior appurtenances; Lessee, and those occupying under Lessee, shall not interfere with the heating apparatus, or with the lights, electricity, gas, water or other utilities of the Building which are not within the apartment hereby demised, nor with the control of any of the public portions of the Building; use of any master television antenna hookup shall be strictly in accordance with regulations of Lessor or Lessor's agent; Lessee and those occupying under Lessee shall comply with and conform to all reasonable rules and regulations that Lessor or Lessor's agent may make for the protection of the Building or the general welfare and the comfort of the occupants thereof, and shall also comply with and conform to all applicable laws and governmental rules and regulations affecting

and "To Rent," and will not interfere with the same.

**RIGHT TO RELET**

8. If Lessee shall abandon or vacate the Premises, the same may be re-let by Lessor for such rent and upon such terms as Lessor may see fit; and if a sufficient sum shall not thus be realized, after paying the expenses of such reletting and collecting, to satisfy the rent hereby reserved, Lessee agrees to satisfy and pay all deficiency.

**HOLDING OVER**

9. If the Lessee retains possession of the Premises or any part thereof after the termination of the term by lapse of time or otherwise, then the Lessor may at Lessor's option within thirty days after the termination of the term serve written notice upon Lessee that such holding over constitutes either (a) renewal of this lease for one year, and from year to year thereafter, at double the rental specified under Section 1 for such period, or (b) creation of a month to month tenancy, upon the terms of this lease except at double the monthly rental specified under Section 1, or (c) creation of a tenancy at sufferance, at a rental of _____ dollars per day for the time Lessee remains in possession. If no such written notice is served then a tenancy at sufferance with rental as stated at (c) shall have been created, and in such case if specific per diem rental shall not have been inserted herein at (c),such per diem rental shall be one-fifteenth of the monthly rental specified under Section 1 of this lease. Lessee shall also pay to Lessor all damages sustained by Lessor resulting from retention of possession by Lessee.

**RESTRICTIONS ON USE**

10. Lessee will not permit anything to be thrown out of the windows, or down the courts or light shafts in the Building; nothing shall be hung from the outside of the windows or placed on the outside window sills of any window in the Building; no parrot, dog or other animal shall be kept within or about the Premises; the front halls and stairways and the back porches shall not be used for the storage of carriages, furniture or other articles.

**WATER AND HEAT**

11. The provisions of subsection (a) only hereof shall be applicable and shall form a part of this lease unless this lease is made on an unheated basis and that fact is so indicated on the first page of this lease, in which case the provisions of subsection (b) only hereof shall be applicable and form a part of this lease.

(a) Lessor will supply hot and cold water to the Premises for the use of Lessee at all faucets and fixtures provided by Lessor therefor. Lessor will also supply heat, by means of the heating system and fixtures provided by Lessor, in reasonable amounts and at reasonable hours, when necessary, from October 1 to April 30, or otherwise as required by applicable municipal ordinance. Lessor shall not be liable or responsible to Lessee for failure to furnish water or heat when such failure shall result from causes beyond Lessor's control, nor during periods when the water and heating systems in the Building or any portion thereof are under repair.

(b) Lessor will supply cold water to the Premises for the use of Lessee at all faucets and fixtures provided by Lessor therefor. Lessor shall not be liable or responsible to Lessee for failure to furnish water when such failure shall result from causes beyond Lessor's control, nor during periods when the water system in the Building or any portion thereof is under repair. All water heating and all heating of the Premises shall be at the sole expense of Lessee. Any equipment provided by Lessee therefor shall comply with applicable municipal ordinances.

**STORE ROOM**

12. Lessor shall not be liable for any loss or damage of or to any property placed in any store room or any storage place in the Building, such store room or storage place being furnished gratuitously and not as part of the obligations of this lease.

**DEFAULT BY LESSEE**

13. If default be made in the payment of the above rent, or any part thereof, or in any of the covenants herein contained to be kept by the Lessee, Lessor may at any time thereafter at his election declare said term ended and reenter the Premises or any part thereof, with or (to the extent permitted by law) without notice or process of law, and remove Lessee or any persons occupying the same, without prejudice to any remedies which might otherwise be used for arrears of rent, and Lessor shall have at all times the right to distrain for rent due, and shall have a valid and first lien upon all personal property which Lessee now owns, or may hereafter acquire or have an interest in, which is by law subject to such distraint, as security for payment of the rent herein reserved.

**NO RENT DEDUCTION OR SET OFF**

14. Lessee's covenant to pay rent is and shall be independent of each and every other covenant of this lease. Lessee agrees that any claim by Lessee against Lessor shall not be deducted from rent set off against any claim for rent in any action.

**RENT AFTER NOTICE OR SUIT**

15. It is further agreed, by the parties hereto, that after the service of notice or the commencement of a suit or after final judgment for possession of the Premises, Lessor may receive and collect any rent due, and the payment of said rent shall not waive or affect said notice, said suit, or said judgment.

**PAYMENT OF COSTS**

16. Lessee will pay and discharge all reasonable costs, attorney's fees and expenses that shall be made and incurred by Lessor in enforcing the covenants and agreements of this lease.

**RIGHTS CUMULATIVE**

17. The rights and remedies of Lessor under this lease are cumulative. The exercise or use of any one or more thereof shall not bar Lessor from exercise or use of any other right or remedy provided herein or otherwise provided by law, nor shall exercise nor use of any right or remedy by Lessor waive any other right or remedy.

**FIRE AND CASUALTY**

18. In case the Premises shall be rendered untenantable during the term of this lease by fire or other casualty, Lessor at his option may terminate the lease or repair the Premises within 60 days thereafter. If Lessor elects to repair, this lease shall remain in effect provided such repairs are completed within said time. If Lessor shall not have repaired the Premises within said time, then at the end of such time the term hereby created shall terminate. If this lease is terminated by reason of fire or casualty as herein specified, rent shall be apportioned and paid to the day of such fire or other casualty.

**SUBORDINATION**

19. This lease is subordinate to all mortgages which may now or hereafter affect the real property of which Premises form a part.

**PLURALS; SUCCESSORS**

20. The words "Lessor" and "Lessee" wherever herein occurring and used shall be construed to mean "Lessors" and "Lessees" in case more than one person constitutes either party to this lease; and all the covenants and agreements herein contained shall be binding upon, and inure to, their respective successors, heirs, executors, administrators and assigns and be exercised by his or their attorney or agent.

**SEVERABILITY**

21. Wherever possible each provision of this lease shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this lease shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this lease.

WITNESS the hands and seals of the parties hereto, as of the Date of Lease stated above.

LESSEE:
X _Madison K. Stolley_ (seal)
_____ (seal)

LESSOR:
_Lucile Marks_ (seal)
_Eugene J. Casa, agent_ (seal)

**ASSIGNMENT BY LESSOR**

On this _____, 19____, for value received, Lessor hereby transfers, assigns and sets over to _____ all right, title and interest in and to the above lease and the rent thereby reserved,

except rent due and payable prior to _____, 19____.

_____ (seal)
_____ (seal)

**GUARANTEE**

On this _____, 19____, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby guarantees the payment of rent and performance by Lessee, Lessee's heirs, executors, administrators, successors or assigns of all covenants and agreements of the above lease.

_____ (seal)
_____ (seal)

Hobley v. Burge, et al
Case No.      03-3678

**Exhibit
3**

87-0036 0 0 5 4 7

## STATEMENT OF POLYGRAPH SUBJECT

Name: _MADISON HOBLEY_

Date: _6 JAN 87_

**At: 1121 South State Street, Chicago, Illinois**

This examination concerns the _FIRE_ of _____

_1110 E. 82 ST_ which occured on _6 JAN 87_,

at _____.

I understand I have the right to remain silent and that anything I say can be used against me in a court of law.

I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer, one will be appointed by the court to represent me before any questioning.

I understand that I have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer.

    1)    I, _MADISON HOBLEY_, do hereby voluntarily submit to taking a polygraph examination.

    2)    I further agree that the final results of this examination may be known and available to the proper person or persons requesting the examination.

    3)    I further do hereby release and forever hold harmless the City of Chicago, their agents, and/or employees, and affiliates.

    4)    I have the right, upon written request, to receive a copy of the results of my polygraph.

_Madison Hobley_
**Signature of Examinee**

_Patrick Garrity_
**Signature of Examiner**

CPD-33.503 (Rev. 11/85)

Hobley v. Burge, et al
Case No.        03-3678

**Exhibit
4**

87-115039

*Special
Prosecutor

AAA
Warrick to
handle

-Act. Judge 7/24

638
3/4/07

EXHIBIT /
Loeb
7-11-05    975

| DATE | JUDGE | A.S.A. | MOTIONS AND RULINGS |
|---|---|---|---|
| 1-22 | Bastan | Warrick | M/S 1-22-86 - ADT |
| 1-23-86 | Bastan | Warrick | M/S 1-23-86. ADT |
| 1-27-86 | Best | JUN | Superseded by indictm + TAV 87U — au. 2-18-87 |
| | | | Cox transferred to Chg Judge to ARR 2-18-87 |

87 CR - 2356

NOTES:

Illicit #31902004

County Defendant born in:

PROBATION/PAROLE VIOLATION

On _____ , 19 _____ A.S.A. _____
furnished Special Remedies Section information relating to the following possible

☐ Parole   ☐ Probation Violation: _____

GRAND JURY NO. _____

☐ True Bill   ☐ No Bill

Date _____

Presenting A.S.A. _____

If direct, approved by _____

VICTIM INFORMATION
CHECK APPROPRIATE BOXES

☐ PUBLIC EMPLOYEE
☐ TEACH SCHOOL EMPLOYEE
☐ PEACE OFF CORRECTIONAL OFF
☐ FIRE PARAMED/AMBUL PER
☐ DRIVER PASSENGER COMM CARR.
☐ SENIOR CITIZEN (60 OR OVER)
☐ JUVENILE (UNDER 17)

**DEFENDANT NUMBER**

Name: NOBLE, MADISON
Address: 1121 S. STATE ST. # 301
Sex: M   Race: B   DOB: 27 JUL 61   IR # 007 765   SID:   FBI:
AKA:   MATT

**CHARGES/ACTIONS   DEFENDANT NUMBER**

| Charge | Action | Reason |
|---|---|---|
| MURDER | APPROVED PER ASA WARNICK | |

**STATEMENT   DEFENDANT NUMBER**

Type: O   Date: 1/6/87   Time: 20:30   Court Reporter:
Statement Witnesses: ASA, DET. DWYER
Statement Summary: Δ TOLD ASA NOT THIS ATTY & ASKED IF ATTY HAD TALKED TO HIM - Δ SD YES & HE DID WANT TO TALK (ATTY STEPHEN JIZEN) Δ EARLIER TOLD DETS HE SET FIRE TO HALLWAY USING & HIS APT DOOR

**ARREST   DEFENDANT NUMBER**

RD/AR No.: J008165   CB/DCN:
Place of Arrest: 1121 S. STATE ST.   Date: 6 JAN 87   Time: 5:30
Arrest Reason: INVESTIG   Means of ID: STMT   ASA Present ☐
Arresting Agency: CPD   Area: 4040   District:
Arresting Officer: ✝ DET. DWYER, R.   Star:   Assignment: A2VC
Arresting Officer: ✝ DET. J. COTTIO   Star: 13674   Assignment: A3VC
Investigator:   Star:   Assignment:

**EVIDENCE/INVESTIGATION**

Additional Investigations Requested: PHOTOS OF Δ, BLDG, PT, N.B.T. STMT'S, MORE
Officer Receiving Request:
Physical Evidence   Property Number: 349343   How Recovered: DET. DWYER
clothes from Δ
351051-GAS can.

**INCIDENT**

Date: 6 JAN 87   Time: 02:10   Weapon type: ARSON
to Date:   to Time:   Location: 1121 S 82 #301 2ND BLDG
Incident Summary: IMMED PRIOR TO ABOVE DT, Δ WENT TO GAS STATION & BOUGHT CAN OF GAS. Δ NICKLATTER WENT TO ABOVE L WHERE HE POURED GAS IN HALLWAY & DIRECTLY OUTSIDE DOOR TO HIS APT. WHERE VS 2 & 3 DS, WIFE & SON WERE. Δ THEN IGNITED GAS W/MATCH, RESULTING FIRE CAUSED DEATH TO VS 1-7 VI APPARENTLY ATT TO SAVE OTHERS BEFORE PERISHING, VS 2 & 3 APPARENTLY

②

SEARCH WARRANT
ARREST
POLICE SHOOTING

| | | Date | Action No | Number of Defendants | Number of Victims/Witnesses | Page | of | Page |

## DEFENDANT NUMBER_____

Name:
Address:
Sex:          Race:          DOB:                    LID:                    SID:                    FBI:
AKA:     Last                          First                          County of Birth

## CHARGES/ACTIONS     DEFENDANT NUMBER_____
Continued ☐

| Charge | Action | Reason |
|--------|--------|--------|
| | | |
| | | |
| | | |

## STATEMENT     DEFENDANT NUMBER_____
Continued ☐

Type:          Date:                    Time:     :          Court Reporter:
Statement Witnesses:
Statement Summary: CONT. GAS CAN & MATCH AFTER ORIGINALLY DENYING INCIDENT.

## ARREST     DEFENDANT NUMBER_____
Continued ☐

RD/AR No.:                    CB/DCN:
Place of Arrest:
Arrest Reason:                                                  Date:          Time:     :
Arresting Agency:          Means of ID:                                        ASA Present ☐
Arresting Officer:                                        Area:          District:
Arresting Officer:                                        Star:          Assignment:
Investigator:                                             Star:          Assignment:
                                                          Star:          Assignment:

## EVIDENCE/INVESTIGATION
Continued ☐

Additional Investigations Requested:
Officer Receiving Request:
Physical Evidence          Property Number          How Recovered

## INCIDENT
Continued ☐

from Date:          between Time:          Weapon type:
to Date:          to Time:          Location:
Incident Summary:

ARREST WARRANT
SUPPLEMENTAL
JUVENILE
POLICE SHOOTING

| | | | | | |
|---|---|---|---|---|---|
| 1/6/87 | 11 | 1 | | 1/84 | 5 6 |
| Date | Action No. | Number of Defendants | Number of Victims/Witnesses | Page | of | Pages |

## DEFENDANT NUMBER

| | | | | | | |
|---|---|---|---|---|---|---|
| Name: | | | | | | |
| Address: | | | | | | |
| Sex: | Race: | DOB: | I/D: | | SID: | FBI: |
| AKA: | | | | Country of Birth | | |

## CHARGES/ACTIONS    DEFENDANT NUMBER _____                                Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## STATEMENT    DEFENDANT NUMBER _____                                Continued ☐

| Type: | Date: | Time:  : | Court Reporter: |
|---|---|---|---|
| Statement Witnesses: | | | |
| Statement Summary: | | | |

## ARREST    DEFENDANT NUMBER _____                                Continued ☐

| | | | | |
|---|---|---|---|---|
| RD/AR No.: | CB/DCN: | | | |
| Place of Arrest: | | | Date: | Time:  : |
| Arrest Reason: | | Means of ID: | | ASA Present ☐ |
| Arresting Agency: | | Area: | District: | |
| Arresting Officer: | | Star: | Assignment: | |
| Arresting Officer: | | Star: | Assignment: | |
| Investigator: | | Star: | Assignment: | |

## EVIDENCE/INVESTIGATION                                Continued ☐

| Additional Investigations Requested: | | |
|---|---|---|
| Officer Receiving Request: | | |
| Physical Evidence | Property Number | How Recovered |
| | | |
| | | |

## INCIDENT                                Continued ☐

| On or from Date: | As or between Time: | Weapon type: |
|---|---|---|
| to Date: | to Time: | Location: |

Incident Summary: CONT,

SAW △ STDG OUTSIDE BLDG WATCHING IT BURN. DURING OCT &

NOV. △ HAD RELATIONSHIP W/ WI & △ & WI LIVED TOGETHER AT

ABOVE L. SOMETIME IN EARLY DEC. WI MOVED OUT & WS 2&3

MOVED IN W/ △ BUT CONTACT W/ WI CONT, ON 2 JAN 87

WI ENDED RP W/ △ ALTHO △ STATED HE WANTED TO GO

AWAY W/ WI. ON 3 JAN 87 V2 APPARENTLY CALLED FOR

WI TO CONFRONT HER FOR 1st TIME MAKING CONTACT W/ WIS NEIGHBOR

W4.

④

| Sex: | Race: | DOB: | LID: | SID: | FBI: |
|---|---|---|---|---|---|

**CHARGES/ACTIONS   DEFENDANT NUMBER** _____   Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**STATEMENT   DEFENDANT NUMBER** _____   Continued ☐

| Type: | Date: | Time:   : | Court Reporter: |
|---|---|---|---|

Statement Witnesses:   ☐ ASA   ☐ P. Officer   ☐ Other

Statement Summary:

**ARREST   DEFENDANT NUMBER** _____   Continued ☐

RD/AR No.:          CB/DCN:

Place of Arrest:          Date:     Time:   :

Arrest Reason:     Means of ID:          ASA Present [ ]

Arresting Agency:          Area:     District:

Arresting Officer:          Star:     Assignment:

Arresting Officer:          Star:     Assignment:

Investigator:          Star:     Assignment:

**VICTIM/WITNESS NUMBER** _____   Continued ☐

Type: DECEASED

Name: BRADFORD    ANTHONY    Mr. Mrs. Ms. Miss Dr. Other:

Address: 1123 E. 82ND #207

Home Phone: (   )     Work Phone: (   )     Ext.

Sex: M   Race: B   DOB: 14 FEB 50   DL:          Public Aid No.:

Property Loss: $     Personal Injury: multiple burns

Related to Defendant: NO. neighbor     Handicap:          36.

Notes: PRONOUNCEMT DR. SHAN 0325 SOUTH CHIC HOSP.

**VICTIM/WITNESS NUMBER** _____2_____   Continued ☐

Type: DECEASED

Name: HOBLEY    ANITA    Mr. Mrs. Ms. Miss Dr. Other:

Address: 1121 E. 82 #301

Home Phone: (   )     Work Phone: (   )     Ext.

Sex: F   Race: B   DOB: 7 APR 62   DL:          Public Aid No.:     24

Property Loss: $     Personal Injury:

Related to Defendant: YES. AS WIFE     Handicap:

Notes: PRONOUNCEMT DR. LIU 0355 SO. SHORE HOSP.

**NEXT EVENT/ASA**

Next event date: 7 JAN 87     Next event: PH     Location: 0072

ASA: LIECHTY     Unit: PRU     Approval type: ☒ Personal ☐ Telephone

**DATA ENTRY** _____ Date _____ Entered By _____ **PCN** _____

(5)

**CHARGES/ACTIONS    DEFENDANT NUMBER _____**                                Continued ☐

| Charge | Action | Reason |
|--------|--------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**STATEMENT    DEFENDANT NUMBER _____**                                      Continued ☐

| Type: | Date: | Time:  :  | Court Reporter: |
|-------|-------|-----------|-----------------|

Statement Witnesses:           ☐ ASA      ☐ P. Officer      ☐ Other

Statement Summary:

**ARREST    DEFENDANT NUMBER _____**                                         Continued ☐

RD/AR No.:                     CB/DCN:

| Place of Arrest: | | Date: | Time:  : |
|---|---|---|---|

| Arrest Reason: | Means of ID: | ASA Present ☐ |
|---|---|---|

| Arresting Agency: | Area: | District: |
|---|---|---|

| Arresting Officer: | Star: | Assignment: |
|---|---|---|

| Arresting Officer: | Star: | Assignment: |
|---|---|---|

| Investigator: | 3 | Star: | Assignment: |
|---|---|---|---|

**VICTIM/WITNESS NUMBER _____**                                              Continued ☐

| Type: DECEASED) | Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other: |
|---|---|

Name  Last HOBLEY   First PHILIP

Address:   1121 E. 82 #301

Home Phone: (   )         Work Phone: (   )            Ext.

Sex: M  Race: B  DOB: 10 OCT 85  DL:         Public Aid No.:

Property Loss: $        Personal Injury: multiple burns

Related to Defendant: Yes. AS SON       Handicap:

Notes:             DR. LIU 03   SO. SHORE

**VICTIM/WITNESS NUMBER _____**     4                                        Continued ☐

| Type: DECEASED) | Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other: |
|---|---|

Name   STEPHENS             HOBLEY

Address:  1121 E. 82ND #   301

Home Phone: (   )         Work Phone: (   )            Ext.

Sex: M  Race: B  DOB: 13 DEC 46  DL:         Public Aid No.:

Property Loss: $        Personal Injury: multiple burns.

Related to Defendant: No. neighbor       Handicap:        4D

Notes:     DR SHAN      0346   SO. CHG.

**NEXT EVENT/ASA**

| Next event date  7 JAN 86 | Next event  PH | Location  6618 |
|---|---|---|

ASA  ULETHY    Unit  PR V   Approval type: ☒ Personal  ☐ Telephone

**DATA ENTRY _____**  Date ____  Entered By ____      PCN _____

⑥

Address:
Sex: Race: DOB: LID: SID: FBI:
AKA:

## CHARGES/ACTIONS    DEFENDANT NUMBER_____    Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |

## STATEMENT    DEFENDANT NUMBER_____    Continued ☐

Type:    Date:    Time:    :    Court Reporter:
Statement Witnesses:    ☐ ASA    ☐ P. Officer    ☐ Other
Statement Summary:

## ARREST    DEFENDANT NUMBER _____    Continued ☐

RD/AR No.:    CB/DCN:
Place of Arrest:    Date:    Time:    :
Arrest Reason:    Means of ID:    ASA Present ☐
Arresting Agency:    Area:    District:
Arresting Officer:    Star:    Assignment:
Arresting Officer:    Star:    Assignment:
Investigator:    Star:    Assignment:

## VICTIM/WITNESS NUMBER _____5_____    Continued ☐

Type DECEASED    Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:
Name ___ HOLTON    First SHERLONE
Address: 1121 E. 82ND #304
Home Phone: ( )    Work Phone: ( )    Ext.
Sex: F    Race: B    DOB: 7/1L60    DL:    Public Aid No.:
Property Loss: $    Personal Injury: multiple burns    26
Related to Defendant: No neighbor    Handicap:
Notes: DK JHAN SO CILG

## VICTIM/WITNESS NUMBER ____6____    Continued ☐

Type DECEASED    Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:
Name LINDZEY    SCHLLENE
Address: 1121 E. 82ND ST #304
Home Phone: ( )    Work Phone: ( )    Ext.
Sex: M    Race: B    DOB: N/A    8 YRS    DL:    Public Aid No.:
Property Loss: $    Personal Injury: multiple burns    8
Related to Defendant: No neighbor    Handicap:
Notes: JACKSON PK DADS DR MUUZON

## NEXT EVENT/ASA

Next event date 7 JAN 87    Next event PH    Location 60/2
ASA LIECHTY    Unit PRI    Approval type: ☐ Personal ☐ Telephone

## DATA ENTRY _____    PCN _____
                  Date            Entered By

(7)

**CHARGES/ACTIONS     DEFENDANT NUMBER_____**                                                     Continued ☐

| Charge | Action | Reason |
|--------|--------|--------|
|        |        |        |
|        |        |        |
|        |        |        |
|        |        |        |

**STATEMENT     DEFENDANT NUMBER_____**                                                           Continued ☐

Type:          Date:                Time:     :          Court Reporter:

Statement Witnesses:                    ☐ ASA          ☐ P. Officer          ☐ Other

Statement Summary:

**ARREST     DEFENDANT NUMBER_____**                                                              Continued ☐

RD/AR No.:                        CB/DCN:

Place of Arrest:                                                  Date:              Time:     :

Arrest Reason:                          Means of ID:                              ASA Present ☐

Arresting Agency:                                    Area:              District:

Arresting Officer:                                   Star:              Assignment:

Arresting Officer:                                   Star:              Assignment:

Investigator:                                        Star:              Assignment:

**VICTIM/WITNESS NUMBER ___7___**                                                                  Continued ☐

Type: DECEASED          Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:

Name: DODDS                              JOHNNY

Address: 1121 E. 82ND #305

Home Phone: (    )              Work Phone: (    )                      Ext.

Sex: F   Race: B   DOB: N/A   DL:                    Public Aid No.:

Property Loss: $          Personal Injury: multiple gwens

Related to Defendant: No. neighbor.              Handicap:

Notes:          JACKSON PK 0705 DR. MUUZON

**VICTIM/WITNESS NUMBER ___4___**                                                                  Continued ☐

Type: CW          Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:

Name: MCDANIEL                  ANGELINA

Address: 4911 S. Wabash

Home Phone: (312) 624-3,773      Work Phone: 312) 663-5700          Ext.

Sex: F   Race: B   DOB: 9 12 8 63   DL:                 Public Aid No.:

Property Loss: $          Personal Injury: none.

Related to Defendant: No. As former Girlfriend   Handicap: Sec'y WORD PROC AT

Notes:                                    MIDW. ASSOC FOR SICKLE CELL

aka WALLER     (w) to Grand Jury 1/7/87     AT 65 E. SOUTH WATER

**NEXT EVENT/ASA**

Next event date: 7 JAN 87          Next event: PH          Location: 60/2

ASA: LIECHTY          Unit: PRV     Approval type: ☒ Personal ☐ Telephone

**DATA ENTRY _____**          Date          Entered By          **PCN** _____

⑧

## CHARGES/ACTIONS  DEFENDANT NUMBER _____

Continued □

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## STATEMENT  DEFENDANT NUMBER _____

Continued □

| Type: | Date: | Time:  : | Court Reporter: |
|---|---|---|---|

Statement Witnesses:    □ASA    □P. Officer    □Other

Statement Summary:

## ARREST  DEFENDANT NUMBER _____

Continued □

| RD/AR No.: | | CB/DCN: | | | |
|---|---|---|---|---|---|
| Place of Arrest: | | | | Date: | Time:  : |
| Arrest Reason: | | Means of ID: | | | ASA Present □ |
| Arresting Agency: | | | Area: | District: | |
| Arresting Officer: | | | Star: | Assignment: | |
| Arresting Officer: | | | Star: | Assignment: | |
| Investigator: | | | Star: | Assignment: | |

## VICTIM/WITNESS NUMBER  2

Continued □

| Type: C I R | | Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other: |
|---|---|---|
| Name: | BLACKBURN | BARBARA |
| Address: | 1123 E 82ND St 1st fl | |
| Home Phone: ( ) 731-6485 | Work Phone: ( ) | Ext. |
| Sex: F Race: B DOB: N/A age 31 DL: | | Public Aid No.: |
| Property Loss: $ | Personal Injury: N/A | |
| Related to Defendant: No  neighbor | Handicap: | |
| Notes: | | |

## VICTIM/WITNESS NUMBER  3

Continued □

| Type: C I R | | Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other: |
|---|---|---|
| Name: | HARRIS | GWEN |
| Address: | 1123 E 82ND 71107 | |
| Home Phone: None | Work Phone: ( ) | Ext. |
| Sex: F Race: B DOB: 4 JAN 55 DL: | | Public Aid No.: |
| Property Loss: $ | Personal Injury: N/A | |
| Related to Defendant: No  neighbor | Handicap: | |
| Notes: | | |

## NEXT EVENT/ASA

| Next event date 7 JAN 07 | Next event PH | Location 6610 |
|---|---|---|
| ASA LIECHTY | Unit HRV | Approval type: ☒ Personal  [ ] Telephone |

## DATA ENTRY _____
     Date         Entered by        PCN _____

Defendant

6612 Branch

MC Number

⑨

**CHARGES/ACTIONS   DEFENDANT NUMBER** _____   Continued ☐

| Charge | Action | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**STATEMENT   DEFENDANT NUMBER** _____   Continued ☐

| Type: | Date: | Time: | : | Court Reporter: |
|---|---|---|---|---|

Statement Witnesses: ☐ ASA  ☐ P. Officer  ☐ Other

Statement Summary:

**ARREST   DEFENDANT NUMBER** _____   Continued ☐

| RD/AR No.: | CB/DCN: |
|---|---|

| Place of Arrest: | | |
|---|---|---|
| Arrest Reason: | Date: | Time: : |

Arresting Agency:                    Means of ID:            ASA Present ☐

| Arresting Officer: | Area: | District: |
| Arresting Officer: | Star: | Assignment: |
| Investigator: | Star: | Assignment: |
| | Star: | Assignment: |

**VICTIM/WITNESS NUMBER** _____   Continued ☐

Type ( *TK*

Name   Last *UNK*   First *VIOLA*   Middle   Suffix

Address: *4911 S. WABASH*

Home Phone: ( )        Work Phone: ( )        Ext.

Sex:   Race: *B*  DOB: *N/A*   DL:   Public Aid No.:

Property Loss: $        Personal Injury:

Related to Defendant: *N*        Handicap:

Notes: *neighbors (D W).*

**VICTIM/WITNESS NUMBER** _____   Continued ☐

Type

Name   Last   Title (Circle One): Mr. Mrs. Ms. Miss Dr. Other:

Address: Street

Home Phone: ( )        Work Phone: ( )        Ext.

Sex:   Race:   DOB:   DL:   Public Aid No.:

Property Loss: $        Personal Injury:

Related to Defendant:        Handicap:

Notes:

**NEXT EVENT/ASA**

| Next event date  *7 JAN 87* | Next event  *PH* | Location |
|---|---|---|
| ASA  *MCCARTY* | Unit  *13 U* | Approval type: ☒ Personal ☐ Telephone |

**DATA ENTRY** _____        _____   PCN _____
Date        Entered By

(10)

Sex:    Race:    DOB:    LID:    SID:    FBI:
AKA:

## CHARGES/ACTIONS    DEFENDANT NUMBER____    Continued ☐

| Charge | Action | Reason |
|--------|--------|--------|
|        |        |        |
|        |        |        |
|        |        |        |

## STATEMENT    DEFENDANT NUMBER____    Continued ☐

Type:    Date:    Time:    :    Court Reporter:
☐ ASA    ☐ P. Officer    ☐ Other
Statement Witnesses:
Statement Summary:

## ARREST    DEFENDANT NUMBER____    Continued ☐

RD/AR No.:    CB/DCN:
Place of Arrest:    Date:    Time:    :
Arrest Reason:    Means of ID:    ASA Present ☐
Arresting Agency:    Area:    District:
Arresting Officer:    Star:    Assignment:
Arresting Officer:    Star:    Assignment:
Investigator:    Star:    Assignment:    Continued ☐

## VICTIM/WITNESS NUMBER____

Type (    Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other:
Name    Last    UNK    First    VIOLA    Middle    Suffix
Address:    4711 S. WABASH
Home Phone: (    )    Work Phone: (    )    Ext.
Sex:    Race:    DOB:    N/A    DL:    Public Aid No.:
Property Loss: $    Personal Injury:
Related to Defendant:  1/2    Handicap:
Notes:    NEIGHBOR TO W/

## VICTIM/WITNESS NUMBER____    Continued ☐

Type    Title (Circle One):  Mr.  Mrs.  Ms.  Miss  Dr.  Other:
Name    Last    First    Middle    Suffix
Address:    Street    City
Home Phone: (    )    Work Phone: (    )    Ext.
Sex:    Race:    DOB:    DL:    Public Aid No.:
Property Loss: $    Personal Injury:
Related to Defendant:    Handicap:
Notes:

## NEXT EVENT/ASA

Next event date    7 JAN 87    Next event    PH    Location
ASA    MCCARTY    Unit    FRU    Approval type: ☒ Personal  ☐ Telephone

DATA ENTRY____    Date    Entered By    PCN____

(10)