Hobley v. Burge, et al
Case No.       03-3678

**Exhibit
45**

STATE OF ILLINOIS   )
                    )  SS.
COUNTY OF C O O K   )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE        )
STATE OF ILLINOIS        )
                         )    #87-2356
        VS               )
                         )
MADISON HOBLEY           )

<u>REPORT OF PROCEEDINGS</u>

BE IT REMEMBERED that this cause came on

for hearing on the 29th day of August, A.D., 1989,

before the Honorable CHRISTY BERKOS, Judge of

this court.

APPEARANCES:

        HON. CECIL A. PARTEE,
            State's Attorney of Cook County, by
        MR. PAUL TSUKUNO, AND
        MR. ANTHONY CALABRESE,
            Assistant State's Attorneys,
            appeared for the People.

        HON. RANDOLPH N. STONE,
            Public Defender of Cook County, by
        MS. JULIE HARMON, AND
        MR. JEFFREY HOWARD,
            Assistant Public Defenders,
            appeared for the defendant.

**164**

1    MR. TSUKUNO:  We would call Sergeant Garrity to

2  the stand.

3                    (Witness sworn.)

4              SGT. PATRICK GARRITY,

5  called as a witness on behalf of the People of the

6  State of Illinois, having been first duly sworn, on

7  the motion, was examined and testified as follows:

8                  DIRECT EXAMINATION

9                  BY MR. TSUKUNO:

10    Q    Please state your name, give your star number

11  and present unit of assignment.

12    A    Patrick Garrity, star number 1271, assigned

13  to the 2nd District.

14    Q    Sergeant Garrity, I want to direct your

15  attention now to January 6th, 1987.  What was the

16  nature of your assignment with the Chicago Police

17  Department on that date?

18    A    The crime lab polygraph section.

19    Q    On January 6th, 1987 did you have an

20  opportunity to speak with an individual who you now

21  know to be one Madison Hobley?

22    A    Yes, I did.

23    Q    Do you see that person here in court today?

24    MS. HARMON:  We'll stipulate to the identification

1    of my client, Judge.

2        THE COURT:  All right.

3    BY MR. TSUKUNO:

4        Q    When on January 6th, 1987 did you speak with

5    Madison Hobley?

6        A    Sometime in the early afternoon.

7        Q    Was that just between yourself and the

8    defendant Madison Hobley?

9        A    Yes, it was.

10       Q    Now prior to having a conversation with the

11   defendant Madison Hobley, did you have an opportunity

12   to advise him of his constitutional rights?

13       A    Yes, I did.

14       Q    Did you do that from memory or from a

15   preprinted source?

16       A    From a preprinted form.

17       Q    And what was that preprinted form?

18       A    It's a waiver that's used in the polygraph

19   section that is presented to a subject before an exam.

20       Q    Now, sergeant, I'm going to show you what has

21   been previously marked as People's Exhibit No. 1, for

22   identification.  Would you take a look at this one

23   page document.

24       A    Okay.

1      Q      Do you recognize People's Exhibit No. 1, for

2   identification?

3      A      Yes, I do.

4      Q      What do you recognize that to be?

5      A      A photostat copy of the waiver that was

6   presented to the defendant prior to the polygraph exam

7   on the 6th of January, 1987.

8      Q      Now are the rights which you administered to

9   the defendant Madison Hobley contained on that

10  particular exhibit?

11     A      Yes, they are.

12     Q      Did you read those rights to the defendant?

13     A      Yes, I did.

14     Q      Would you read to the judge as you read to

15  the defendant the rights which you gave to the

16  defendant.

17     A      I understand I have the right to remain

18  silent and that anything I say can be used against me

19  in a court of law.  Do you understand that right.  I

20  understand that I have the right --

21     THE COURT:  What was his response?

22     THE WITNESS:  His response was yes, he does.  I

23  understand that I have a right to talk to a lawyer and

24  have him present with me during questioning, and if I

-11-89 mc63

345

1  cannot afford to hire a lawyer one will be appointed

2  by the court to represent me before any questioning.

3     MS. HARMON:  Judge, if I may I would stipulate

4  that Officer Garrity read the rights that are on that

5  preprinted form.

6     THE COURT:  Okay.

7     MS. HARMON:  Just for expediency sake.

8     THE COURT:  All right.

9  BY MR. TSUKUNO:

10     Q    Sergeant, did the defendant indicate that he

11  understood the meaning of what you were telling him?

12     A    Yes, he did.

13     Q    What did he say in regards to that?

14     A    He just said to me yes, I do, in response to

15  my question do you understand what I've just read to

16  you.

17     Q    Now did you observe the defendant place his

18  signature upon that document?

19     A    Yes, I did.

20     Q    And did you yourself place your signature on

21  that document?

22     A    Yes, I did.

23     Q    And is this a true and accurate photostatic

24  copy of the rights form which you read to the

-11-89 mc64

1    defendant and upon which the defendant signed his own

2    name?

3         A    Yes, it is.

4         Q    Now during your conversation -- did you

5    subsequently then have a further conversation with the

6    defendant?

7         A    Yes, I did.

8         Q    During this conversation did you ask him how

9    far he went in school?

10        A    Yes, I did.

11        Q    What did he tell you?

12        A    He said that he went as far as freshman year

13   in college.

14        Q    Did you ask him how his health was?

15        A    Yes, I did.

16        Q    What did he say?

17        A    That it was all right.

18        Q    Did you ask how he's feeling right now?

19        A    Right now meaning at the time of the exam?

20   Yes, I did.

21        Q    What did he say?

22        A    He said that he was feeling okay.

23        Q    Did you ask him --

24        MS. HARMON:    Judge, I would object at this time if

13

-11-89 mc65

347

1    these were questions asked as part of the polygraph

2    exam.

3        THE COURT:   I'm going to overrule your objection

4    at this point.

5    BY MR. TSUKUNO:

6        Q    Sergeant Garrity, did you ask the defendant

7    Madison Hobley if he was on any medication?

8        A    Yes, I did.

9        Q    What did he say?

10       A    He said that he wasn't on any doctor's

11   medication but he had taken an aspirin.

12       Q    Did you ask the defendant if he was seeing a

13   doctor?

14       A    Yes, I did.

15       Q    What did he say?

16       A    He said no.

17       Q    Did you ask him when was the last time you

18   used marijuana?

19       A    Yes, I did.

20       Q    What did he say?

21       A    The previous week.

22       Q    And did you ask him when was the last time he

23   had alcohol?

24       A    Yes, I did.

-11-89 mc66

Hobley v. Burge, et al
Case No.      03-3678

**Exhibit
46**

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF COOK    )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE    )
STATE OF ILLINOIS    )
                     )  No. 87 - 2356
        VS           )
                     )  Charge:  Murder
MADISON HOBLEY       )

Hon. Christy Berkos

Judge of said Court

July 20, A. D. 1990

Court convened pursuant to adjournment.

APPEARANCES:

HON. CECIL A. PARTEE
    State's Attorney of Cook County, by
MR. PAUL TSUKUNO and
MR. GEORGE VELCICH,
    Assistant State's Attorneys

    appeared for the People;

MR. RANDOLPH N. STONE,
    Public Defender of Cook County, by
MR. CLYDE LEMONS and
MS. JULIE HARMON
    Assistant Public Defender,

    appeared for the Defendant.

S73

1                  PATRICK   GARRITY,

2  a witness called by the People herein, having been

3  duly sworn, was examined and testified as follows:

4               DIRECT EXAMINATION

5               BY MR. VELCICH

6      Q    Sir, would you please tell us your name and

7  spell your last name.

8      A    Patrick Garrity, G-a-r-r-i-t-y.

9      Q    What is your occupation?

10     A    I am a sergeant with the Chicago Police

11  Department.

12     Q    How long have you been a Chicago Police

13  Officer?

14     A    Approximately fourteen years.

15     Q    What is your current assignment, right now?

16     A    Patrol Division, Second District.

17     Q    Back in January of 1987 to what unit of the

18  Chicago Police Department were you assigned?

19     A    Chicago Police Department, Crime Lab.

20     Q    How long had you been assigned there in the

21  beginning of January, 1987?

22     A    Approximately two years.

23     Q    Now, I want to direct your attention to the

24  afternoon of January the 6th, 1987.   That was a

148

**1121**

1    Q    What was his answer?

2    A    He said no.

3    Q    Did you ask him the last time he had

4    consumed any alcohol?

5    A    Yes, I did.

6    Q    What was his answer?

7    A    He said that the last time was on Sunday.

8    Q    Again, this conversation took place on

9    Tuesday, is that right?

10   A    I believe it was Tuesday, yes.

11   Q.   Now, did you ask him some questions about

12   the fire that took place at his apartment building

13   during the previous night?

14   A    Yes, I did.

15   Q    Specifically what did you ask him about

16   that?

17   A .  I asked him if he started the fire.

18   Q    What did he say?

19   A    He said no.

20   Q    What else did you ask him about the fire?

21   A    I asked him if he knew who started the

22   fire.

23   Q    What did he say?

24   A    He said no.

155

1    Q    What else did you ask him?

2    A    I said even though he didn't know for sure,

3    was there anyone who he suspected would be

4    responsible for starting the fire?

5    Q    What was his answer then?

6    A    He said that maybe Angelina may have

7    started that fire.

8    Q    Did he tell you who Angelina was?

9    A    Yes, he did.  He explained her name, rather

10   she was his girlfriend.

11   Q    Did he describe to you, did he give you

12   some information about his romantic relationship with

13   Angelina and his wife?

14   A    Well, he stated that Angelina was very

15   upset with him, that she had paid some monies for the

16   apartment on East 82nd Street; that they were

17   battling and that she was very upset with him. I

18   asked him specifically had she made a threat to burn

19   that building and his apartment and he said no, but I

20   asked if she had made any other threats to him and he

21   said yes, threats to the extent of, you will see, or

22   you know I am going to get at you, and at one point

23   while they were speaking she made an attempted to

24   scratch him in his eyes.

156                    **1129**

1    Q    Did he tell you when was the last time he

2    saw Angelina?

3    A    I believe it was Friday before this.  It

4    would have been Tuesday I was interviewing him.

5    The last Friday before was the last time he saw her

6    he said.

7    Q    Did he tell you what her feelings about him

8    were?

9    A    Well, they were, at the time they were

10   strained, the relationship was very strained.

11   Q    Did you ask him what happened on the morning

12   of the fire when he discovered there was a fire in

13   the building?

14   A    Yes, I did.

15   Q    What did he say to you then?

16   A    He said that at the time he was sleeping

17   with his wife in the apartment; that he heard an

18   alarm; that he was not positive at the time but he

19   knew it was in the early morning.  It may have been

20   three o'clock; that he got up, left his apartment

21   and went out to investigate in the hallway; that he

22   observed steam coming from the carpeting in the

23   hallway and that he smelled smoke and he began to

24   check doors in the hallway. At that point he

157

**1130**

1   with me and looked away from me and kind of slumped
2   in the chair he was sitting in.
3       Q    What did he say?
4       A    At that time I said to him that it was a
5   very serious investigation, that I believed he was
6   not telling the truth, that he was responsible for
7   starting that fire last night and it was important
8   that he told the truth.
9       Q    What did he say?
10      A    At that time he told me that, in fact, he
11  was responsible for starting that fire, that he did
12  set, start that fire in the apartment building last
13  night.
14      Q    Did you ask him how he did it?
15      A    Yes, I did.
16      Q    What did he say?
17      A    He told me that prior to starting the fire
18  he had taken a gas can and gone to a gas, local gas
19  station on Cottage Grove.  He didn't provide the other
20  intersecting street, and that he said he returned to
21  the building, that he poured gasoline in the hallway,
22  outside his apartment and poured gasoline in the
23  stairwell, that he took a match and lit the gasoline
24  igniting it and that he threw the gas can somewhere

160                        **1133**

1 on the second floor hallway.

2 Q   Now, when he told you that what did you say?

3 A   I said to him, well, what was the reason for

4 this?

5 Q   What did he say?

6 A   He said he was experiencing not only

7 troubles with his girlfriend, Angelina, but he was

8 also experiencing a lot of marital troubles with his

9 wife.

10 Q   At the time that he told you about throwing

11 the gas can on the second floor, did you know that a

12 gas can was used to start this fire?

13 A   No, I did not.

14 Q   And did you know that a gas station on

15 Cottage Grove had been involved somehow in this fire?

16 A   No, I did not.

17 Q   After you completed that conversation with

18 Madison Hobley, what did you do?

19 A   I left the room and I made efforts to

20 notify the investigating detective.

21 Q   What department or unit of the Chicago

22 Police Department was specifically assigned to

23 investigate this case?

24 A   Well, there are actually two. One was

161

Hobley v. Burge, et al
Case No.        03-3678

**Exhibit
47**



```
 1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

    MADISON HOBLEY,
 4                                        )
                                          )
                       Plaintiff,         )
 5                                        )
                                          )
           -vs-                           )   No. 03 C 3678
 6                                        )
    CHICAGO POLICE COMMANDER JON BURGE,    )
 7  DET. ROBERT DWYER, DET. JAMES LOTITO,)
    DET. VIRGIL MIKUS, DET. DANIEL         )
 8  McWEENEY, DET. JOHN PALADINO,          )
    SGT. PATRICK GARRITY and the           )
 9  CITY OF CHICAGO,                       )
                                          )
10                     Defendants.         )

11

12                    consolidated with

13         IN THE DISTRICT COURT OF THE UNITED STATES
             FOR THE NORTHERN DISTRICT OF ILLINOIS
14                     EASTERN DIVISION

15

    STANLEY HOWARD,
16                                        )
                                          )
17                     Plaintiff,         )
                                          )
18         -vs-                           )   No. 03 C 8481
                                          )
19  CITY OF CHICAGO, Present and Former   )
    Chicago Police Officers JOHN BYRNE,   )
20  JAMES LOTITO, RONALD BOFFO, DANIEL    )
    McWEENEY, JOHN PALADINO, ROBERT DWYER,)
21  FRANK GLYNN, JON BURGE, LEROY MARTIN, )
    TERRY HILLARD, and other UNKNOWN      )
22  CHICAGO POLICE OFFICERS, as well as   )
    THOMAS NEEDHAM, and GAYLE SHINES,     )
23                                        )
                       Defendants.         )

24
                                          et al.
```

1    Deposition of **COMMANDER PATRICK GARRITY**, taken

2    before Katherine M. Spelson, C.S.R., and Notary Public,

3    pursuant to the Federal Rules of Civil Procedure for the

4    United States District Courts pertaining to the taking

5    of depositions at Suite 100, 312 North May Street,

6    Chicago, Cook County, Illinois, at 10:02 a.m. on the

7    26th day of April, A. D. 2007.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

66

1    initial interview with Detective Falasz?

2        A    No, I don't.  I don't recall filling out this

3    form (indicating).

4        Q    In the normal course of your procedures, would

5    you be writing down the information you see on the

6    report that you just talked about while you were

7    interviewing Detective Falasz?

8        A    In the normal course of procedures, I would be,

9    yes.

10       Q    And would that include filling in that "in" box

11   in the upper left that's says "6 Jan, '87, 1230 hours"?

12       A    Would that include me filling in that?

13       Q    Yes, sir.

14       A    Yes.

15       Q    And what does that notation indicate?

16       A    Well, the date, which was 6 January, 1987,

17   1230 hours, which is 12:30 p.m.

18       Q    And that indicates the time at which

19   Detective Falasz brought Mr. Hobley in and then you

20   began this process; is that correct?

21       A    Correct.

22       Q    So the other information that Detective Falasz

23   provided to you is in that remarks section above the

24   handwritten part that talks about "results"; is that

67

1    it's reflected on the report.  And following procedures,

2    that's where I would have gotten the information, from

3    Detective Falasz.

4        Q    And other than Detective Falasz, you don't

5    recall there being any other possible source of that

6    information at the time you filled out this form?

7        A    If he had a partner that day, I don't recall who

8    it was.  And the only thing that triggers Falasz is I

9    see the name as written on the report that he was the

10   one that I noted.

11       Q    And as you sit here, you only recall him showing

12   up as well, correct?

13       A    I don't have any real independent recollection

14   of when they came down.

15       Q    But other than Detective Falasz, would it be

16   fair to say that the only other person or source of that

17   information would have been if he had a partner there

18   with him and the two of them were talking to you?

19       A    Correct.

20       Q    And then at the bottom just above where it says

21   "results," it says,

22            "S and wife previously arguing over marital

23            problems."

24       Is that something else that Detective Falasz

66

1    correct?

2        A    Correct.

3        Q    So Detective Falasz told you that this was a

4    fire in a multiflat apartment building, correct?

5        A    Yes.

6        Q    And that it appears to have been started on

7    third-floor hallway?

8        A    Correct.

9        Q    And "S" is subject, correct?

10       A    Correct.

11       Q    So that would be Mr. Hobley, correct?

12       A    Correct.

13       Q    That he was a resident of the building, correct?

14       A    Correct.

15       Q    And that his wife and child had died in the

16   fire, correct?

17       A    Correct.

18       Q    And then that Hobley had stated that he heard an

19   alarm, entered the hallway, walked around, saw smoke in

20   the stairwell and then left -- Is that "building" there?

21       A    Yes, it looks to be "building."

22       Q    Okay.  That's something that Detective Falasz

23   related to you about Mr. Hobley, correct?

24       A    I have no independent recollection of that, but

68

1    told you?

2        A    I have no independent recollection of that, but

3    it's written there.  And that would have been provided

4    by Falasz.

5        Q    And do you have any recollection or knowledge of

6    where or how Detective Falasz got the information that

7    you see here in the "remarks" section?

8        A    I don't have any recollection of where Falasz

9    got his information.

10       Q    Do you recall Detective Falasz telling you that

11   Mr. Hobley had been in custody and had been interrogated

12   for some time prior to him bringing Hobley to the

13   polygraph department?

14       A    I have no recollection of that, those statements

15   being made by Detective Falasz.

16       Q    In the normal course of proceeding or following

17   your protocols, would it have been your practice to note

18   in the "remarks" section that the subject had been in

19   custody and had been interrogated prior to being brought

20   to the polygraph section?

21       A    If the subject was under arrest, we may have

22   noted that.

23            In this particular case from what I have

24   reviewed, I don't believe that he was under arrest.  At

137

1   Mr. Hobley from the time you first walked into the
2   examination room and saw him to the time that he was led
3   away by the detectives, did you ever kick Mr. Hobley in
4   the shins or the knees or the legs?
5      A  No, I did not kick Madison Hobley at any time
6   that I was with him.
7      Q  Did you wear cowboy boots at that time?
8      A  Cowboy boots?
9      Q  Did you wear any kind of boots?
10     A  I have no recollection of ever owning cowboy
11  boots in my life.
12        And did I wear any kind of boots?
13     Q  Yes, sir.
14     A  I have no recollection of wearing boots.
15     Q  Did you ever, in the course of talking to
16  Mr. Hobley, raise your voice or yell or get in his face
17  and basically be yelling or screaming at him?
18     A  I have no recollection of ever raising my voice
19  to the point where I'd be yelling and screaming at him.
20  I have no recollection of anything like that.
21     Q  Did you ever call Mr. Hobley a "nigger"?
22     A  No, I did not.
23     Q  Did you ever use any kind of racial epithets
24  towards Mr. Hobley?

*SKYLINE COURT REPORTING, INC.*
*312.618.0071*

138

1     A  I have no recollection. No, I did not.
2     Q  Did you ever ball up your fist and threaten to
3  strike Mr. Hobley with your fist?
4     A  No recollection of ever doing anything like that
5  with Mr. Hobley.
6     Q  Did you ever have any kind of physical contact
7  with him other than hooking him up to the machine?
8     A  No, I did not.
9     Q  Have you ever used the word "nigger" in your
10 life?
11     A  Have I ever uttered the word in my life?
12     Q  Yes, sir.
13     A  Yes, I have probably uttered the word in my
14 life.
15     Q  Under what circumstances do you recall uttering
16 that word?
17     A  It's not a word that I use in my vocabulary.
18 But in my lifetime have I ever said it?  I can't think
19 of one specific time when I would have.  But I have
20 would have to say that at some time in my lifetime, I
21 probably have.
22     Q  Do you recall under the circumstances you have
23 used that word?
24     A  No, I don't.  I can't think of a specific time

*SKYLINE COURT REPORTING, INC.*
*312.618.0071*

139

1  when I would have used the word.
2     MR. FEUER:  Let's take a five-minute break.
3        (Recess taken.)
4     MR. FEUER:  Q  Commander Garrity, could you look at
5  Exhibit No. 5, Garrity Deposition Exhibit No. 5?  It's
6  titled "Supplementary Report."
7     A  Yes, I do.
8     Q  Okay.  And is this a report that you had any
9  part of in filling out?
10     A  I don't have any recollection of filling it out,
11  but that's my writing at the bottom (indicating).
12     Q  Your signature there?
13     A  Yes, and that's mine writing "John Stout."
14     Q  Do you recall typing this up?
15     A  I don't recall typing this up.
16     Q  Given the fact that you signed it and put
17  Stout's name on it, does that indicate that you were the
18  one to fill this out?
19     A  Well, it could have.  This is like a
20  housekeeping report and, you know, has obviously limited
21  information.  I don't recall doing it, but I could have
22  done it.
23     Q  When you say "housekeeping report," is this kind
24  of like a final report that you do when you've completed

*SKYLINE COURT REPORTING, INC.*
*312.618.0071*

140

1  a polygraph examination?
2     A  Yes, it's just something that used to go with
3  the file indicating, as it does, simply with the
4  subjects, the date and time, who requested the test and
5  then the report with "Hobley - Not truthful, posttest
6  admission" and "McDaniel - Truthful."
7     Q  And looking in the bottom box in the middle, it
8  indicates, does it not, that you finished this
9  report on January 8th of 1987?
10     A  That's what it says.  It was submitted that day,
11  yes.
12     Q  So you put this together at some point a couple
13  of days after the actual polygraph examination of
14  Mr. Hobley?
15     A  If, in fact -- I don't recall doing it.  But if
16  I did it, it would have been.  That's correct.  What the
17  report reflects is that it was on the 8th of January.
18     Q  And now other than the documents that you have
19  in front of you and in particular Exhibits 1 through 5,
20  did you fill out any other kind of forms or make any
21  other kinds of notes in connection with this case?
22     MR. SOTOS:  Just for the record there has already
23  been reference to the spectrographs that he testified
24  there was some notations on.

*SKYLINE COURT REPORTING, INC.*
*312.618.0071*

Hobley v. Burge, et al
Case No.       03-3678

**Exhibit
48**

```
 1   STATE OF ILLINOIS   )
                         )  SS:
 2   COUNTY OF C O O K   )

 3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT - CRIMINAL DIVISION

 4

 5   THE PEOPLE OF THE           )
     STATE OF ILLINOIS,          )
 6                               )
            vs.                  )  No.  87-02356
 7                               )
     MADISON HOBLEY.             )
 8

 9

10                    REPORT OF PROCEEDINGS had at

11   the hearing of the above-entitled cause, before

12   the Honorable DENNIS J. PORTER, one of the Judges

13   of said Division, on Thursday, the 13th day of

14   July, A.D., 2000.

15

16   PRESENT:
             THE HONORABLE RICHARD A. DEVINE,
17           STATE'S ATTORNEY OF COOK COUNTY, by,
             MR. THOMAS GAINER and MS. CELESTE STACK,
18           Assistant State's Attorneys,
                appeared on behalf of the People of the
19              State of Illinois.

20           MS. ANDREA LYON, MR. KURT H. FEUER,
             and
21           MS. EVE HANAN,
                appeared on behalf of the Defendant.

22

23   Reported by:
     Barbara A. Evans, C.S.R.,
24   Official Court Reporter
```

1

CITY 003149

1          Q     Okay.

2                I now want to show you what's

3    been previously marked as Petitioner's Exhibit

4    No. 6.

5          MS. LYON:  May I approach the witness

6    again, your Honor?

7          THE COURT:  You may.

8    BY MS. LYON:

9          Q    I would ask you to take a look at

10   that.  It's apears to be another arrest report

11   regarding Andre Council?

12         A    Yes.

13         Q    What's the charge in that arrest

14   report?

15         A    It's difficult to read, but obviously

16   an arson for, looks like investigate arson and

17   then the body says that he was picked up for

18   investigation of an arson that occurred at 8216

19   S. Dobson.  That's the one I was talking about.

20         Q    2816 S. Dobson, is that close to

21   where this fire was?

22         A    Just around the corner.  And, in

23   fact, that's the where we had gone and talked to

24   the witnesses of the fire that had been started

28

CITY 003176

1  in that building and that Andre Council had been

2  seen running away from it.

3        Q      Okay.

4               And that building, the one on

5  South Dobson, was that an apartment building?

6        A      Yes.

7        Q      Was that fire started by gasoline?

8        A      Yes.

9        Q      Was that fire started by gasoline

10  being poured on the stairs in that apartment

11  building?

12        A      Yes, it was.

13        Q      Did you find that to be significant

14  in any way?

15        A      Obviously that's why we wanted to

16  introduce it this fire.  Here was a fire that, in

17  my opinion, that was in many ways very similar to

18  the fire at the building where Madison was

19  accused of starting.  And we had a witness at

20  that said that Andre Council was seen running

21  from that building.  In fact, he had been picked

22  up on it because I knew that he had been picked

23  up on it.

24               Though he had been released it

**CITY 003177**

1   was our position that he was released because he

2   was the witness again Madison Hobley.   We

3   believed it was relevant and at least for the

4   jury to decide whether he had been released or

5   given some consideration because of his role as a

6   witness.   We were precluded by Judge Berkos at

7   the State's vehement objection.   We had a big

8   conference in chambers.   I think that's in the

9   transcript.

10       Q   Ms. Harmon, calling your attention to

11   the handwritten notes indicating that Mr. Council

12   is going to be released and it's sign by

13   detective Arkia (phonetically), it looks like

14   Sherwin there, had you seen those handwritten

15   notes before at trial?

16       A   No, I never got a copy that contained

17   those notes.

18       Q   I also want to call your attention to

19   the portion of the report that has the words

20   written V-e-l-e-c-i, could be an l, could be a c,

21   could be a t, h, and the notation 11B24 under

22   that.   Do you see that?

23       A   I see.

24       Q   What does that mean to you?

30

CITY 003178

Hobley v. Burge, et al
Case No.      03-3678

**Exhibit
49**

ORIGINAL

1

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    MADISON HOBLEY,                     )
                                         )
4                 Plaintiff,             )
                                         )
5            vs.                         )  No. 03 C 3678
                                         )
6    CHICAGO POLICE COMMANDER JON        )
     BURGE, DET. ROBERT DWYER, DET.      )
7    JAMES LOTITO, DET. VIRGIL MIKUS,    )
     DET. DANIEL McWEENY, DET. JOHN      )
8    PALADINO, SGT. PATRICK GARRITY,     )
     and the CITY OF CHICAGO,            )
9                                        )
                  Defendants.            )
10
```

11            The deposition of **JULIE M. HARMON** taken

12   pursuant to notice of taking deposition, before

13   Tracy Jones, C.S.R. No. 084-004553, Certified

14   Shorthand Reporter within and for the County of

15   Cook, State of Illinois, at 10 South Wacker Drive,

16   Chicago, Illinois, on the **11th day of August 2005.**

17

18       APPEARANCES:

19           LOEVY & LOEVY, by
             MR. KURT H. FEUER
20           (312 North May Street, Suite 100
              Chicago, Illinois  60607)
21               appeared on behalf of the plaintiff;

22

23

24

2

```
 1        APPEARANCES:   (Cont'd.)

 2            HERVAS, SOTOS, CONDON & BERSANI, P.C., by
             MR. MICHAEL W. CONDON
 3           (333 Pierce Road, Suite 195
              Itasca, Illinois  60143)
 4               appeared on behalf of the defendants
                 Chicago Police Commander Jon Burge,
 5               Det. Robert Dwyer, Det. James Lotito,
                 Det. Virgil Mikus, Det. Daniel
 6               McWeeny Det. John Paladino,
                 Sgt. Patrick Garrity;
 7
             DYKEMA GOSSETT ROOKS PITTS, by
 8           MR. LEE T. HETTINGER
             (10 South Wacker Drive, Suite 2300
 9            Chicago, Illinois  60606)
                 appeared on behalf of the defendant
10               City of Chicago;

11           HOOKS LAW OFFICES, P.C., by
             MR. WILLIAM H. HOOKS
12           (29 South LaSalle Street, Suite 333
              Chicago, Illinois  60603)
13               appeared on behalf of the deponent.

14

15

16

17

18

19

20

21

22

23

24
```

1    there," what do you refer to that as?  Is that your

2    trial file?

3        A.    Correct.

4        Q.    Okay.  And with respect to the Madison

5    Hobley case, you were the lead attorney on the

6    trial, correct?

7        A.    I was.

8        Q.    Okay.  And how many trial files did you

9    maintain with respect to Madison Hobley's case?

10        A.    I couldn't tell you.  I started off

11    with the public defender file, it's a manilla, very

12    little stretch to it file.  So that would have gone

13    then into my next thing that I always use was a

14    brown accordion type file.  I know there was a

15    couple of those.

16                Then I ended up getting a xerox room

17    box and putting stuff in there.  I know we used

18    these two brown transfer cases, but I think that

19    was when we were totally done with the case, and we

20    all put our stuff together.  I kept it in a big

21    drawer, I don't know.  You know, like one of those

22    credenza sliding drawers.  I would not be able to

23    tell you how many particular of those little files

24    there were.

1   related to the post-conviction hearings that you

2   knew there were two RD numbers before the trial

3   started, would that have been accurate?

4        A.   Oh, it was early in the case I learned,

5   I just don't know exactly when I learned it.  Not

6   the first date.  At some point, a document came

7   that had another RD number that I then referenced.

8        Q.   And my question is you knew that before

9   the trial started.

10       A.   Yes, absolutely.

11       Q.   Okay.  Let me show you what was

12  previously marked in Jeff Howard's deposition as

13  Howard Exhibit No. 1, ask you to take a look at

14  that document.

15       A.   Yes.

16       Q.   Have you seen that document or a copy

17  of that document before?

18       A.   Yes.

19       Q.   Okay.  And what do you understand it

20  to be?

21       A.   A fingerprint report.

22       Q.   Okay.  And am I correct that you

23  testified in your deposition and at the

24  post-conviction hearing that you hadn't received

71

1   that fingerprint report at any time during the

2   course of Madison Hobley's trial?

3          A.     Correct.

4          Q.     Okay.  Now, you had sent subpoenas to

5   the crime lab before the trial started asking them

6   for any fingerprint reports, correct?

7          A.     I had.

8          Q.     Okay.  And it's your testimony -- am I

9   correct that it's your testimony that you never

10  received the results of any such --

11         A.     Correct.

12         Q.     -- test?

13         A.     Correct.

14         Q.     Okay.  Did you -- at any time prior to

15  trial or during the course of the trial, did you

16  file any motion with the court asking that the

17  results of any fingerprint tests be turned over?

18         A.     During trial.

19         Q.     Okay.  And that was at the point that

20  you made the motion for a mistrial; is that

21  correct?

22         A.     Correct.

23         Q.     How about prior to that?

24         A.     I can't tell you that.  I know that I

1    would in court ask for all -- did they give

2    everything, do I have all the reports on a number

3    of different occasions.  I suspect I specifically

4    asked in court if the State had any fingerprint

5    reports, but I'm presuming that.  I would have to

6    get every date's court reporter to see if that's

7    true or not.

8         Q.    Okay.  Based on what you've testified

9    to in your deposition at the post-conviction

10   hearing, you were aware that Detective Dwyer had

11   written a supplemental report where he claimed that

12   the can had been tested for fingerprints, and it

13   came back negative?

14        A.    Correct.

15        Q.    Okay.  And you knew that before the

16   trial started?

17        A.    Correct.

18        Q.    Okay I'm going show you what you we've

19   had marked as Howard Exhibit 3.  Have you seen the

20   document which we've had marked as Exhibit No. 3?

21        A.    Yes.

22        Q.    You've seen that before today?

23        A.    Yes.

24        Q.    Do you know when the first time was

1   would suspect -- not when they said there was no

2   report, but I don't know that.  I mean, I have no

3   knowledge.

4   BY MR. CONDON:

5       Q.    Okay.  All right.  Let me lastly show

6   you what was previously marked as Howard Exhibit 5.

7               Have you had an opportunity to

8   review Howard Exhibit 5?

9       A.    Yes, I have.

10      Q.    Okay.  And that consists of three

11  pages, correct?

12      A.    Correct.

13      Q.    Have you ever seen the first page of

14  the exhibit, the arrest report regarding Andre

15  Council?

16      A.    Yes.

17      Q.    And did you see that arrest report

18  prior to Madison Hobley's trial beginning?

19      A.    Yes.

20      Q.    Okay.  If you would go to the third

21  page of Howard Exhibit 5.  Have you seen that

22  document before?

23      A.    I have.

24      Q.    And what is that?